Jim HODGES, Governor of the State of South Carolina, in His Official Capacity, Plaintiff,

v.

Spencer ABRAHAM, Secretary of the Department of Energy, in His Official Capacity and the United States Department of Energy, Defendants.

Civil Action No. 1:02–1426–22.

United States District Court, D. South Carolina, Aiken Division.

June 17, 2002.

William L. Want, William Want Law Office, Charleston, SC, Lionel S. Lofton, Lofton Law Firm, Charleston, SC, Stephen Potts Bates, Office of the Governor of South Carolina, Columbia, SC, for Plaintiff.

Christie Newman Barrett, Robert F Daley, Jr., U.S. Attorneys Office, Columbia, SC, for Defendants.

Neil C. Robinson, Jr., Nexsen Pruet Jacobs Pollard and Robinson, Charleston, SC, for Movants.

Jay Bender, Baker Ravenel and Bender, Columbia, SC, for Interested Paries.

Robert F Daley, Jr., U.S. Attorneys Office, Columbia, SC, for Counter–Claimant.

William L. Want, William Want Law Office, Lionel S. Lofton, Lofton Law Firm, Charleston, SC, Stephen Potts Bates, Office of the Governor of South Carolina, Columbia, SC, for Counter–Defendant.

## MEMORANDUM OPINION AND ORDER GRANTING DOE'S MOTION FOR SUMMARY JUDGMENT AND DENYING GOVERNOR HODGES' MOTION FOR A PRELIMINARY INJUNCTION

CURRIE, District Judge.

## TABLE OF CONTENTS

INTRODUCTION ................................................849

DISCUSSION ..................................................850

I. DOE'S MOTION FOR SUMMARY JUDGMENT ON HODGES' COMPLAINT ................................................850
 A. National Environmental Policy Act (NEPA) ..............851
 B. Standard of Review Under Administrative Procedure Act (APA) ..........854

 C. History of NEPA Compliance in this Action ............................ 855
 1. The 1996 S & D PEIS ......................................... 855
 2. July 1998 Supplement Analysis ........................................ 857
 3. February 2002 Supplement Analysis .................................... 858
 4. April 19, 2002 Amended Record of Decision .......................... 859
 D. Analysis of NEPA Compliance ....................................... 860

II. HODGES' MOTION FOR PRELIMINARY INJUNCTION ..................... 863
 A. Likelihood of Irreparable Harm to Plaintiff ............................. 864
 B. Likelihood of Harm to Defendant ..................................... 866
 1. DOE's Arguments as to Harm to DOE Caused by Injunction .......... 866
 a. Foreign Policy Interests ...................................... 867
 b. National Security Interests .................................... 868
 c. Costs and Delay in Rocky Flats Clean-up ....................... 868
 2. Hodges' Arguments as to Harm to DOE Caused by Injunction ......... 868
 a. Foreign Policy Interests ...................................... 869
 b. National Security Interests .................................... 870
 c. Costs & Delay in Rocky Flats Clean-up ........................ 870
 3. Court's Analysis of Harm to DOE if Injunction Granted .............. 870
 a. Harm to Foreign Policy Interests .............................. 871
 b. Harm to National Security .................................... 872
 c. Substantial Additional Costs and Delay in Rocky Flats Clean-
 up ......................................................... 872
 d. Disruption of Planned Activities at SRS ......................... 873
 e. Conclusion as to Harm to Defendant ........................... 873
 C. Balance of Harms to Parties .......................................... 873
 D. Likelihood of Success on the Merits ................................... 874
 E. Public Interest ...................................................... 874
 F. The Equitable Balance ............................................... 874

CONCLUSION ............................................................. 874

## INTRODUCTION

Plaintiff Jim Hodges, the Governor of South Carolina (Hodges), initiated this action on May, 1, 2002, challenging the April 19, 2002, Amended Record of Decision (April 19, 2002 ROD) by Defendants, Spencer Abraham, Secretary of the Department of Energy and the United States Department of Energy (collectively DOE), to, *inter alia*, transfer six metric tons of surplus plutonium from Rocky Flats Environmental Technology Site ("Rocky Flats") to the Savannah River Site ("SRS") in South Carolina for long-term storage. Specifically, Hodges asserts that the April 19, 2002 ROD was issued in violation of both the National Environmental Policy Act, 42 U.S.C. §§ 4321–4370d (NEPA),

and the Administrative Procedure Act, 5 U.S.C. § 702 *et seq.* (APA).

This matter came before the court for hearing on June 13, 2002, on Hodges' motion for preliminary injunction and DOE's motion for summary judgment on the complaint. At the conclusion of the hearing, the court ruled from the bench, granting DOE's motion for summary judgment and denying Hodges' motion for a preliminary injunction.[1] Two other pending motions were also ruled on orally at the time of the hearing and have been dealt with by separate orders: DOE's motion for summary judgment on its counterclaim; and DOE's motion to seal certain portions of the record.

At the time of the hearing DOE had indicated an intent to begin immediate shipments of the Rocky Flats plutonium to SRS as early as June 15, 2002.[2] DOE has

---

**1.** The court stated its intention to prepare a written order as soon as possible.

**2.** DOE initially indicated that the first shipment might be sent on or after May 15, 2002.

since agreed to defer shipments to no sooner than June 22, 2002.

The long-term storage addressed by the April 19, 2002 ROD is independent of any plan to process the surplus plutonium for disposition (at SRS or elsewhere). Prior to April 19, 2002, existing RODs addressed storage pending disposition under a hybrid approach consisting of both immobilization and a program for converting the plutonium to Mixed Oxide Fuel (MOX). Prior RODs also placed conditions on transfer of Rocky Flats plutonium to SRS relative to insuring transfer would not occur unless an immobilization facility was to be located in South Carolina. The most recent ROD, however, cancels plans for immobilization. It also acknowledges that plans for the MOX conversion process are no longer certain as cancellation of immobilization has resulted in the need to redesign MOX with a concomitant need to perform proper environmental studies of the new MOX process as required by NEPA.[3] Thus, the storage authorized by the challenged April 19, 2002 ROD must be analyzed as approval of long-term storage which might extend indefinitely.[4]

In his complaint, Hodges argues that the April 19, 2002 ROD is illegal because: (1) no proper environmental analysis of the potential impact of the currently planned long-term storage has been conducted as required by NEPA (first cause of action); (2) no supplemental environmental impact statement (SEIS) was prepared to address the changes relative to an earlier Environmental Impact Statement (EIS) (second cause of action); (3) prior RODs which imposed conditions on storage of additional surplus plutonium at SRS have not been properly amended to eliminate the conditions (third cause of action); (4) the decision contained in the ROD violates the APA as it is arbitrary and capricious; and (5) the manner in which the decision was made violates the APA because it violates the due process rights of the State.[5]

## DISCUSSION

### I. DOE'S MOTION FOR SUMMARY JUDGMENT ON HODGES' COMPLAINT

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(c). It is well established that summary judgment should be granted "only when it is clear that there is no dispute concerning either the facts of the controversy or the inferences to be drawn

DOE subsequently agreed to defer shipment until on or after June 15, 2002, in order to allow this court to receive full briefing on these motions.

**3.** Prior environmental studies and RODs covered both MOX and immobilization. At the time of those studies and decisions, certain categories of surplus plutonium were considered inappropriate for MOX processing. In cancelling the immobilization program, DOE also decided to modify MOX to process these previously excluded categories of plutonium. All parties agree that these modifications require new environmental studies under NEPA. Thus, DOE, at present, still hopes to

implement MOX at some time in the future. It cannot, however, state at this time if and when it will be able to do so.

**4.** If DOE had not designated the current ROD as selection of the alternative of long-term storage at SRS, it ran the risk of a determination of improper segmentation under NEPA. *See, e.g., South Carolina ex rel. Campbell v. O'Leary,* 64 F.3d 892, 898 (4th Cir.1995).

**5.** The complaint also challenged transport of the plutonium in a particular form of container for which DOE was seeking a national security waiver. That issue is now moot as DOE is no longer seeking the waiver.

from those facts." *Pulliam Inv. Co. v. Cameo Properties,* 810 F.2d 1282, 1286 (4th Cir.1987).

The party moving for summary judgment has the burden of showing the absence of a genuine issue of material fact, and the court must view the evidence before it and the inferences to be drawn therefrom in the light most favorable to the nonmoving party. *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). When the defendant is the moving party and the plaintiff has the ultimate burden of proof on an issue, the defendant must identify the parts of the record that demonstrate the plaintiff lacks sufficient evidence. The nonmoving party, here the plaintiff, must then go beyond the pleadings and designate "specific facts showing that there is a genuine issue for trial." FED.R.CIV.P. 56(e); *see also generally Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

A party "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." *Beale v. Hardy,* 769 F.2d 213, 214 (4th Cir.1985). Therefore, "[m]ere unsupported speculation ... is not enough to defeat a summary judgment motion." *Ennis v. National Ass'n of Bus. & Educ. Radio, Inc.,* 53 F.3d 55, 62 (4th Cir.1995).

In ruling on summary judgment in the present case, the court must also bear in mind the standard of review applicable to the underlying action which is conducted under Section 706 of the Administrative Procedure Act (APA) and provides in part that "a reviewing court shall ... hold unlawful and set aside agency action, findings, and conclusions found to be—(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Further, the Fourth Circuit has clarified:

In determining whether agency action violates § 706(2)(A) of the APA, we perform only the limited, albeit important, task of reviewing agency action to determine whether the agency conformed with controlling statutes, and whether the agency has committed a clear error of judgment.... [T]he ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency.

*Zeneca, Inc. v. Shalala,* 213 F.3d 161, 167 (4th Cir.2000) (internal quotations and citations omitted). *See also infra* "Standard of Review Under Administrative Procedure Act."

## A. National Environmental Policy Act (NEPA)

■ The National Environmental Policy Act (NEPA) "declares a national policy of protecting and promoting environmental quality." *Hughes River Watershed Conservancy v. Glickman,* 81 F.3d 437, 443 (4th Cir.1996). *See also* 42 U.S.C. §§ 4321, 4331(a) (stating that NEPA's policy is "to use all practicable means and measures ... to create and maintain conditions under which man and nature can exist in productive harmony"); *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 348, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989). To ensure that environmental quality is protected and promoted, NEPA requires federal agencies undertaking projects that will affect the environment to follow certain procedures. Thus, "it is well settled that NEPA does not mandate that agencies reach particular substantive results," only that agencies follow certain procedures before taking action. *Hughes,* 81 F.3d at 443. "If the adverse environmental effects of the proposed action are adequately identified and evaluated, [agencies are] not constrained by NEPA from deciding that other values outweigh the

environmental costs." *Robertson*, 490 U.S. at 350, 109 S.Ct. 1835.

Procedurally, NEPA requires that federal agencies prepare an environmental impact statement (EIS) "in every recommendation or report on proposals for ... major Federal actions significantly affecting the quality of the human environment." *See* 42 U.S.C. § 4332(2)(C). In determining whether a proposed action might significantly affect the quality of the human environment and necessarily be studied in an EIS, the Council on Environmental Quality (CEQ)[6] requires agencies to consider both the significance of the "context" and the "intensity" of the proposed action. Considering a proposed action in context means:

> that the significance of an action must be analyzed in several contexts such as society as a whole (human, national), the affected region, the affected interests, and the locality. Significance varies with the setting of the proposed action. For instance, in the case of a site-specific action, significance would usually depend upon the effects in the locale rather than the world as a whole. Both short- and long-term effects are relevant.

40 C.F.R. § 1508.27(a). Evaluating the intensity of the proposed action refers to the "severity of impact." *Id.* § 1508.27(b). CEQ regulations also provide several factors to consider when determining the "severity of the impact" or intensity of the proposed action. The court finds the following factors most relevant to this case:

(1) Impacts that may be both beneficial and adverse. A significant effect may exist even if the Federal agency believes that on balance the effect will be beneficial.

(2) The degree to which the proposed action affects public health and safety.

 . . . . .

(4) The degree to which the effects on the quality of the human environment are likely to be highly controversial.

(5) The degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks.

 . . . .

(8) The degree to which the action ... may cause loss or destruction of significant scientific, cultural, or historical resources.

 . . . . .

(10) Whether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment.

*Id.* §§ 1508.28(b)(1)-(2), (4)-(5), (8), (10). Courts have viewed the presence of one or more of these factors as an indication that an agency should prepare an EIS. *See Public Serv. Co. of Colo. v. Andrus*, 825 F.Supp. 1483, 1495 (D.Idaho 1993) (quoting *LaFlamme v. FERC*, 852 F.2d 389, 398 (9th Cir.1988)).

▮▮▮ An EIS serves two purposes: (1) when deciding whether to take a proposed action, an EIS ensures that an agency will carefully consider the project's environmental effects, and (2) an EIS ensures that the public will received relevant information about a proposed project and play a

---

6. The Council on Environmental Quality, created for the purpose of researching and advising the President on environmental matters, *see* 42 U.S.C. §§ 4341–47, has issued guidelines for implementing NEPA. These guidelines are to be followed by all federal agencies. *See Andrus v. Sierra Club*, 442 U.S. 347, 358, 99 S.Ct. 2335, 60 L.Ed.2d 943 (1979). The specific CEQ regulations at issue here are explicitly incorporated into DOE's regulations. *See* 10 C.F.R. §§ 1021.100–103 (1992).

role in both the decision making process and the implementation of a decision. *See* 40 C.F.R. §§ 1500.1(b) ("NEPA procedures must insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken.... Accurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA."), 1502.1 (stating that an EIS must "provide full and fair discussion of significant environmental impacts and shall inform the decision makers and the public of reasonable alternatives"); *Robertson*, 490 U.S. at 349, 109 S.Ct. 1835; *Hughes*, 81 F.3d at 443. To serve these dual aims, every environmental impact statement must include:

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

42 U.S.C. § 4332(2)(C)(i)-(v).

Once an EIS is prepared, an agency must continue to give careful consideration to the proposed project's environmental consequences, and sometimes submit a supplemental EIS (SEIS). CEQ regulations determine when an agency must prepare a SEIS. Those regulations require a SEIS when "(i) [t]he agency makes substantial changes in the proposed action that are relevant to environmental concerns; or (ii)[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c)(1)(i) & (ii).

■ DOE also has its own regulations to address when a SEIS should be prepared. Those regulations state that "DOE shall prepare a supplemental EIS if there are substantial changes to the proposal or significant new circumstances or information relevant to environmental concerns, as discussed in 40 C.F.R. 1502.9(c)(1)." 10 C.F.R. § 1021.314(a). In the Fourth Circuit, moreover, "substantial" changes in a proposed project or "significant" new circumstances or information will be found to be present when there is a "*seriously* different picture of the environmental impact of the proposed project from what was previously envisioned." *Hickory Neighborhood Defense League v. Skinner*, 893 F.2d 58, 63 (4th Cir.1990) (internal quotation marks omitted) (emphasis added in the original); *see also Marsh v. Or. Nat'l Res. Council*, 490 U.S. 360, 374, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989). Significance can be viewed in either quantitative or qualitative terms. *See Envtl. Defense Fund v. Marsh*, 651 F.2d 983, 996 (5th Cir.1981) (finding that plaintiffs failed to offer evidence that environmental impacts would differ significantly in "either quantity or quality"); *Vine Street Concerned Citizens, Inc. v. Dole*, 630 F.Supp. 24, 29 (E.D.Pa.1985) (evaluating whether projected increase in traffic was "quantitatively or qualitatively" different from that considered in original EIS). Thus, the principal factor an agency should consider in exercising its discretion whether to prepare an SEIS because of new information or substantial changes is the extent to which the new information or substantial changes present a seriously different picture of the likely quantitative or qualitative environmental consequences associated with the proposed action not envisioned by the original EIS.

If it is unclear whether a SEIS is required, DOE regulations require the preparation of a Supplement Analysis (SA). A SA "shall discuss the circumstances that are pertinent to deciding whether to prepare a supplemental EIS," (*i.e.,* applicable CEQ regulations found in 40 C.F.R. § 1502.9(c)(1)(i) & (ii)), and "contain sufficient information for DOE to determine whether: (i)[a]n existing EIS should be supplemented; (ii)[a] new EIS should be prepared; or (iii)[n]o further NEPA documentation is required." *See* 10 C.F.R. §§ 1021.314(c)(1), (2)(i)-(iii). Furthermore, "DOE shall make the determination and the related Supplement Analysis available to the public for information." *See id.* § 1021.314(c)(3). If DOE decides to take action on a proposal covered by an EIS, then DOE must prepare a Record of Decision to make available to the public. *See id.* §§ 1021.314(d), 315(b)-(d).

**B.** **Standard of Review Under Administrative Procedure Act (APA)**

■ The standard of review for an agency's decision not to prepare a SA or SEIS is provided by the Administrative Procedure Act (APA), 5 U.S.C. §§ 701 *et seq.* *See* 5 U.S.C. § 706(2)(A) (giving court the power to "hold unlawful and set aside agency action, findings, and conclusions found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"); *Marsh,* 490 U.S. at 375–76, 109 S.Ct. 1851. *See also* 5 U.S.C. § 702 (providing a right to judicial review to persons "adversely affected or aggrieved" by federal agency action within the meaning of a relevant statute such as NEPA). In reviewing an agency's decision not to prepare a SA or SEIS, a court must "ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious." *Baltimore Gas & Elec. v. Nat'l Res. Defense Council, Inc.,* 462 U.S. 87, 97–98, 103

S.Ct. 2246, 76 L.Ed.2d 437 (1983). Thus, the court must make two decisions: (1) whether the agency took a "hard look" at the substantial changes to the proposal or significant new circumstances or information related to environmental concerns, and (2) whether the agency's decision not to prepare a SA or SEIS was arbitrary or capricious. *See Hughes,* 81 F.3d at 443 (citing *Marsh,* 490 U.S. at 385, 109 S.Ct. 1851). A decision within an agency's discretion is entitled to deference and a court may not substitute its own judgment for that of the agency. *See Kleppe v. Sierra Club,* 427 U.S. 390, 410 n. 21, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976). Within these bounds, however, a court "must make a searching and careful inquiry into the facts and a review of whether the decision [at the time it was made] was based on a consideration of the relevant factors and whether there has been a clear error of judgment" or rather, a rational basis exists for the agency's decision. *See City of Alexandria, Va. v. Fed. Highway Admin.,* 756 F.2d 1014, 1017 (4th Cir.1985) (internal quotation marks omitted); *Sierra Club v. U.S. Army Corps of Eng'rs,* 772 F.2d 1043, 1050–51 (2d Cir.1985) (citing *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.,* 419 U.S. 281, 290, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974)).

■ Generally, "an agency takes a sufficient hard look when it obtains opinions from its own experts, obtains opinions from experts outside the agency, gives careful scientific scrutiny and responds to all legitimate concerns that are raised." *Hughes River Watershed Conservancy v. Johnson,* 165 F.3d 283, 288 (4th Cir.1999) (Hughes River II) (internal quotations omitted). The court is not, however, required to accept an agency's conclusory statements in an EA or an EIS. *Lower Alloways Creek Tp. v. Public Serv. Elec. & Gas Co.,* 687 F.2d 732, 741 (3d Cir.1982)

("An agency cannot ... avoid its statutory responsibilities under NEPA merely by asserting that an activity it wishes to pursue will have an insignificant effect on the environment.").

It is undisputed that in reviewing DOE's decision not to prepare a SA, a SEIS, or another EIS, the court makes its decision based on the administrative record and in light of the above discussed legal standards. In NEPA cases, however, courts have also allowed extraneous evidence in narrow circumstances such as when the evidence: (1) explains technical information or agency action not adequately explained in record; (2) shows an agency failed to consider relevant evidence; or (3) shows an agency, in bad faith, failed to include information it considered in the record. See Webb v. Gorsuch, 699 F.2d 157, 159 n. 2 (4th Cir.1983) (considering several affidavits and reports which were not made part of the "record" in determining whether the agency action was arbitrary or capricious) (citing County of Suffolk v. Sec'y of the Interior, 562 F.2d 1368, 1384 (2d Cir.1977), and cases cited therein).

## C. History of NEPA Compliance in this Action

The decisions challenged in this action are DOE's decisions, as stated in the April 19, 2002 ROD, to: (1) cancel plans to build any immobilization facilities (at SRS or elsewhere); (2) select "the alternative of immediate implementation of consolidated long-term storage at [SRS] of surplus plutonium now stored separately at [Rocky Flats] and SRS;" and (3) "[u]tilize the KAMS facility for consolidated long-term storage of surplus plutonium."[7] 67 Fed. Reg. at 19432 & 19435 (Def.Ex.F). Only the latter ,two decisions are discussed here.[8]

Hodges argues that these decisions are illegal because DOE has not complied with NEPA's requirements for proper study of the environmental impacts of either: (1) long-term storage of Rocky Flats plutonium at SRS; or (2) use of the KAMS facility for long-term storage. DOE responds that it has adequately studied both aspects of the present decision, pointing to the following evidence of NEPA compliance:

December 1996 PEIS— "Storage and Disposition of Weapons–Usable Fissile Materials Final Programmatic Environmental Impact Statement" (1996 S & D PEIS)—Def. Ex. B (Summary) & H (Vol. I);

7. "KAMS" refers to the "K–Area Materials Storage" facility which is located in Building 105–K. See infra July 1998 Supplement Analysis.

8. The court has concluded that the cancellation of immobilization is not, in and of itself, subject to challenge under NEPA. Rather, the significance of cancellation of immobilization is that it either means that plutonium slated for immobilization would remain in long-term storage or would require processing by other means not yet studied. DOE has announced its decision to study processing this additional plutonium into MOX fuel. This has led to placement of the previously studied and approved MOX fuel process on hold, to allow for redesign and corresponding NEPA review. The net effect of these two decisions is that, unless and until a new MOX (or other) process has undergone proper review and been accepted as the proper course of action by DOE, it must be presumed that any storage at SRS is long-term storage. Thus, this analysis focuses on the latter two decisions: to move Rocky Flats plutonium to SRS for long-term storage and to use the KAMS facility for that storage.

July 1998 SA— "Supplement Analysis for Storing Plutonium in the Actinide Packaging and Storage Facility and Building 105–K at the Savannah River Site" (July 1998 SA)—Def. Ex. I;

February 2002 SA— "Supplement Analysis for Storage of Surplus Plutonium Materials in K-area Material Storage Facility at SRS" (February 2002 SA)—Plaintiff Ex. 16, Defendant Ex. K.

*See* DOE's June 10, 2002 Reply at 3 (stating that "the question before the court is fairly simple. Does this combination of the 1996 PEIS and the two Supplement Analyses (SA) demonstrate that DOE evaluated the environmental impacts of its proposed action as required by NEPA?"). These documents are summarized below.

### 1. The 1996 S & D PEIS

The 1996 S & D PEIS studied a variety of alternatives for storage and disposition of a range of nuclear materials stored at various sites throughout the country. Among the alternatives studied was the "No Action" alternative of leaving all materials at their present locations. This alternative was compared to various consolidation alternatives which would have involved SRS ranging from transfer of Rocky Flats surplus plutonium to SRS up to "collocation" of all of DOE's surplus plutonium and highly enriched uranium (HEU) at SRS.

In places, the summary of this EIS distinguishes between the studied plans for nonsurplus and surplus plutonium, referring to plans for long-term storage of up to fifty years only as to *non* surplus plutonium and "storage pending disposition" for *surplus* plutonium. *E.g.,* S–2, S–4, S–6.

*See also* Vol. I at 1–5. Nonetheless, when read in their entirety, it appears from both the summary and the full PEIS that in-depth consideration was given to various long-term storage options for surplus plutonium under circumstances such as the present: where disposition was intended but could not be assumed to be available due to various uncertainties as to development and approval of the necessary technology.[9] *E.g.,* S–42 to S–43, Vol. I at 1–6 & 1–12. It also appears that whatever storage was considered was assumed to be for a period of up to fifty years. *E.g.,* Vol. I, Chart at 2–166.

Nonetheless, as to all long-term storage alternatives, the PEIS presumes that a new facility known as the Actinide Packaging and Storage Facility (APSF) would be built at SRS. *E.g.,* S–7 (stating surplus plutonium from Rocky Flats brought to SRS would be stored in "an expanded, planned new facility" which refers to the "planned new [APSF] ... upon completion"); S 18 (discussing No Action alternative of leaving all materials at their current sites with the materials being stored in "modified or new facilities ... designed to operate for up to 50 years"). This assumption is, presumably, based on an earlier decision, made in 1995, to build the APSF at SRS in order to stabilize, package and store materials already located at SRS.[10] Thus, the references in the PEIS to

9. Although generally programmatic in scope, this EIS considered "the maximum site impacts that would result at [each of the sites under consideration, including] SRS from combining the Preferred Alternative for storage with the Preferred Alternative for disposition at each of these sites." S–25. *See also* S–27 to S–42 (discussing the various categories of environmental impact of the combined alternatives on each of the different potential

sites). Site specific cumulative impacts were also addressed under various alternatives including Long–Term Storage Alternatives and the identified Preferred Alternative. S–43 (listing areas for which impacts were identified as to each site as to the long-term storage alternatives).

10. *See* October 20, 1995, Interim Management of Nuclear Material Environmental Impact Statement, Administrative Record Item

an "expanded, planned new facility" for receipt of the Rocky Flats materials recognize that modifications would be required to the already planned APSF to accommodate the added materials from Rocky Flats. *See also* S–16 (noting that "any new facility construction deemed necessary to maintain safe, secure storage would be addressed in appropriate, individual site-specific EISs"); S–19 (discussing potential construction of an entirely different facility if plutonium from all sites was brought to SRS—"collocation" option).

### 2. July 1998 Supplement Analysis

The impetus for the July 1998 SA was DOE's desire to begin shipments from Rocky Flats to SRS before the APSF facility would be completed.[11] To that end, this SA addresses "use of Building 105–K at SRS for plutonium storage in addition to changes to the conditions established in the January 1997 Record of Decision." SA at 1. In addition to use of Building 105–K (KAMS), this SA addresses "processing plutonium from [Rocky Flats] in the F–Area (FB–Line) at SRS for declassification purposes, and packaging this declassified material at SRS to meet DOE's long-term storage standard." SA at 2. *See also* SA at 6 (discussing use of FB–Line for declassification); SA at 10 (estimating declassification would require four years using the FB–Line).

As to KAMS, this SA provides:

Portions of Building 105–K would be modified to enable safe, secure plutonium storage. Safeguards and security features would be upgraded, criticality monitoring devices would be installed, structural features would be inspected

and repaired, and roof vents would be added and doors would be modified. Several areas of the facility would be decontaminated and excess equipment would be removed to provide additional floor space.

SA at 5 (also providing specifics as to certain modifications). *See also* SA at 19 (estimating that the modifications would require 18 months to complete). The July 1998 SA also provides: "Once APSF is operating, DOE could transfer RFETS material from Building 105–K to the APSF to allow for operational flexibility. The plutonium from RFETS ... would remain in storage at the APSF and Building 105 K pending disposition." SA at 6. *See also* SA at 9 (noting maximum storage capacity in Building 105–K is 15 metric tons). The radiological risks of storage in Building 105–K were evaluated for a ten year period. SA at 17.

This SA concludes:

The impacts of the proposed action on many resource areas are comparable to the impacts identified in the Storage and Disposition PEIS's Preferred Alternative. The proposed action would result in a higher level of waste generation and electrical usage.... However, these increases are well within the SRS's waste treatment capabilities and electrical capacity.... The Supplemental Analysis shows that the proposed action does not make a substantial change to environmental concerns evaluated in the Storage and Disposition PEIS. Also, the proposed action does not present significant new circumstances or information relevant to the environmental concerns eval-

33; December 19, 1995 Record of Decision and Notice of Preferred Alternatives for the Interim Management of Nuclear Materials EIS, 60 Fed.Reg. 65300, Administrative Record Item 32.

**11.** The July 1998 SA acknowledges, nonetheless, that early movement of Rocky Flats sur-

plus plutonium to SRS is only one of a number of modified actions necessary to allow early closure of Rocky Flats. SA at 3–4. Some of these other actions required NEPA review. SA at 4.

uated in the Storage and Disposition PEIS.

SA at 23–24.

### 3. February 2002 Supplement Analysis

The proposed action addressed by the February 2002 Supplement Analysis is to: continue with the previous decision to store surplus plutonium from [Rocky Flats] in KAMS pending disposition. In addition, DOE is proposing to use the KAMS facility for interim storage of surplus plutonium from other DOE sites, as needed. The storage of surplus plutonium materials in KAMS could extend beyond the 10 years estimated in the [July 1998 SA]. KAMS would serve as an interim storage facility pending disposition of the materials. DOE would also maintain the SRS Surveillance Program and the K–Area Structural Assessment Program to provide the basis for continued safe storage of the surplus plutonium materials beyond 10 years in the KAMS facility.

SA at 3.

The February 2002 SA describes the July 1998 SA as supporting storage of up to 15 metric tons of surplus plutonium in KAMS for up to 10 years, pending construction of APSF. It acknowledges that DOE cancelled plans to build APSF in January 2001, "substituting plans to (1) install stabilization and packaging capability in Building 235–F; (2) use existing vault space in the same building; (3) use space in the FB–Line for interim storage pending final disposition; and (4) continue to use existing vault space in Building 105–K.". This SA also refers to the subsequent decision to install stabilization and packaging facilities on the FB–Line. SA at 3.

This SA undertakes to compare the increased risks posed by extended use of KAMS to the risks previously considered in the above referenced PEIS and SA. It states that the radioactive waste estimates originally provided for storage at APSF for up to fifty years

would not significantly change for KAMS for two reasons. First, storage at KAMS does not involve opening the 9975 shipping containers or otherwise exposing the facility areas or personnel to radioactive contamination. Secondly, the expected periodic maintenance and surveillance operations involving the 9975 shipping containers do not exceed the anticipated handling operations previously analyzed for APSF.

SA at 5. It also finds "no significant additional radiological impacts to either the general public or non-involved workers beyond 10 years from normal storage operations in KAMS." *Id.*

As to the risk of harm in the event of an accident, the February 2002 SA relies on the evaluation in the 1998 SA which found that "accident impacts associated with KAMS would be at least three orders of magnitude greater than the potential impacts from APSF" due to the lack of a HEPA filtration system. SA at 6. Nonetheless, because the risk of such an accident is viewed as very small, this SA, as the one before it, finds the difference in magnitude of harm from any accident (1000 times greater) does not justify further study through a new EIS. SA at 6.

Structural considerations are also addressed, including specific concerns which had been raised by the Defense Nuclear Facilities Safety Board (DNFSB). The February 2002 SA contains a fairly technical discussion of wall thickness and characteristics, noting some concerns and an inability to make "an accurate determination of the remaining life of the structure." SA at 7. Rather than finding this to require further study before a decision was made, this SA indicates that the issue will be addressed through "follow-up condition surveys of the Building 105–K structures

every five years to assure safe storage at KAMS beyond 10 years."

The February 2002 SA also relies on the protection provided by the combination of the 3013 storage containers and the 9975 shipping containers. It notes that the 9975 shipping containers "were qualified for a minimum 10–year life." It, therefore, requires "periodic surveillance of the Celotex packing material as well as the O-ring seals." This will be accomplished by removing ten containers per quarter, transporting them to the FB-line, opening them for inspection and maintenance, then resealing them and returning them to KAMS. SA at 7.

Based on this discussion, the SA concludes:

> The potential impacts from the storage of surplus plutonium materials in the KAMS facility at SRS, pending final disposition, are not significantly different than or are bounded by the impacts identified in the preferred storage alternative for SRS in the S & D PEIS. There are no significant non-radiological impacts for storage in KAMS. The radiological impacts from normal storage operations at KAMS are not significantly different than those previously analyzed for APSF. The potential radiological accident impacts from KAMS are still small and comparable to the impacts identified for the Preferred Alternative in the Storage and Disposition PEIS. For a loss of confinement inside KAMS, an unfiltered release would result. However, the APSF/B105–K SA results show that potential accident impacts at KAMS are still small (less than 1 LCF) and have a low frequency of occurrence (less than 1.0E–3 event per year).

> A review of these radiological impact analyses (IMNM EIS, S & D PEIS, and APSF/B105–K SA) allows DOE to conclude that potential impacts for the storage of surplus plutonium materials at KAMS are similar and not significantly different than the impacts for APSF. To further mitigate the potential risks, DOE expects to reduce the annual frequency of the release of radioactive material to less than $1.0E-6$ through the application of engineered and administrative controls. The engineered and administrative controls include the implementation of surveillance programs for the 3013 containers inside the 9975 shipping containers and for the structure of Building 105–K. *These results demonstrate that safe storage of surplus plutonium in KAMS can continue beyond 10 years pending disposition. DOE plans to disposition its surplus plutonium as soon as practical and believes storage in KAMS would be necessary for less than 20 years.*

SA at 8 (emphasis added).

### 4. April 19, 2002 Amended Record of Decision

Through its Amended ROD, DOE makes three revisions to its prior RODs which directly affect SRS. First, it cancels plans for immobilization. Second, it selects "the alternative of immediate implementation of consolidated long-term storage at [SRS] of surplus plutonium now stored separately at [Rocky Flats] and SRS." 67 Fed.Reg. at 19432. Third, it determines to "[u]tilize the KAMS facility for consolidated long-term storage of surplus plutonium." 67 Fed.Reg. at 19435.

DOE explains the relationship between the first two decisions as follows: "Cancellation of the immobilization facility and selection of this storage alternative remove the basis for the contingency contained in the previous RODs conditioning transport of non-pit surplus plutonium from [Rocky Flats] to SRS for storage on the selection of SRS as the site for the immobilization facilities, and those RODS are so amended." *Id.* While the storage decision is expressly stated to be long-term, DOE,

nonetheless, indicates that it is pursuing a MOX disposition strategy as discussed in its recent report to Congress. *Id.* However, "No final decisions regarding the MOX portion of the program will be made until [proper NEPA] reviews are completed." *Id.*

### D. Analysis of NEPA Compliance

■ The 1996 PEIS appears to fully address the environmental considerations relevant to long-term storage of plutonium at SRS, including storage of additional plutonium from Rocky Flats, for a period of up to fifty years. Although that storage was intended to be "pending disposition," the 1996 PEIS recognized that disposition could not be assumed during that period. Thus, the situation studied was similar to the present, where the environmental analysis must assume that long-term storage is required, even though DOE intends to implement one or more disposition technologies, because the disposition technology has not been approved.

In addition, DOE prepared two subsequent Supplement Analyses both of which concluded that a Supplemental EIS was not required. The first, issued in July 1998, approved short-term use of KAMS (up to ten years) awaiting completion of APSF, in order to allow earlier shipment of Rocky Flats plutonium. The second, issued in February 2002, expressly addressed longer-term use which DOE referred to as "interim storage" (SA at 8) and stated, in the conclusion, was not likely to extend beyond twenty years (SA at 8).

At the hearing, counsel for Hodges conceded that the July 1998 Supplement Analysis was adequate to support the decision to utilize KAMS, under the conditions addressed in that SA: short-term use of KAMS to store Rocky Flats and SRS plutonium until APSF was completed. Further, there is no suggestion that any challenge was made to the July 1998 SA at the time it was issued or to the subsequent ROD [12] which relied on it. Neither, apparently, was there any challenge to a later EIS completed in November 1999 which relied on the July 1998 SA.[13]

Hodges does, however, contend that the February 2002 SA failed to adequately consider the risks of long-term use of KAMS. Hodges also argues that, at the least, DOE cannot rely on the February 2002 SA to support its April 19, 2002 ROD authorizing long-term storage of up to fifty years because the 2002 SA presumes storage pending disposition (referred to as "interim storage" in this SA) and may be read to address only a twenty-year period. SA at 3 & 8. DOE responds that this is an overly narrow reading of the February 2002 SA because the actual factors considered looked at risks over a fifty-year period.

In this regard, DOE directs the court to specific portions of the 2002 SA addressing various criteria on a fifty-year basis (*e.g.,* the expected useful life of the 3013 containers). *See* Defendant's Reply [in support of] Defendant's Motion for Summary Judgment at 7. Hodges has not countered with direction to any evidence that the evaluation was not adequate to cover the fifty-year period challenged in the April 19, 2002 ROD.

In an affidavit filed in support of Hodges' motion for a preliminary injunction, Plaintiff's expert, Dr. Allison Macfarlane, refers, generically, to the risks of delay in disposition including an unspecified increase in the "potential for

---

12. Amended ROD for the Storage and Disposition of Weapons–Usable Fissile Materials, 63 Fed.Reg. 43386 (August 13, 1998).

13. *See* Surplus Plutonium Disposition Final Environmental Impact Statement (SPD EIS), DOE/EIS–0283, (November 1999). Def. Ex. C (Summary) and D (Vol.I).

accidents (including criticality events), and the potential for exposure to workers and the public." Macfarlane May 3, 2002 Affidavit (Macfarlane I) ¶ 16. Macfarlane also notes that the recent decision "will result in the storage of large quantities of plutonium at [SRS] while it awaits use." Macfarlane I ¶ 21 (also noting that prior decisions coupled disposition and storage). Similarly, she points to the cancellation of APSF, replacement with plans to use facilities in building 235–F, then replacement of that plan with a decision to use the FB–Line as raising concerns. *E.g.*, Macfarlane I ¶ 23–24. She does not, however, provide specific information on which this court can rely to conclude that DOE failed to consider some specific inadequacy in the changed plans which now envision long-term storage.[14] Rather, she raises a series of questions without pointing to specific inadequacies in the plans and procedures. *Id.* ¶ 26. The most specific concern which Macfarlane addresses is the lack of clarity in the record as to whether the FB–Line has been completed, as this is a function she contends the latest ROD presumes to be in place. *Id.* ¶ 2.

In a subsequent affidavit, Macfarlane addresses the specific risks posed by storage of plutonium in more detail. Macfarlane Affidavit signed June 4, 2002 (Macfarlane II). This affidavit does not, however, address how the current plans for storage are inadequate or, more particularly, how they present significant changes relative to circumstances previously considered in EISs or SAs. *E.g.*, Macfarlane II ¶¶ 16–21. She does, however, again identify the one specific concern as to whether the stabilization and packaging facilities at FB Line have been completed. *Id.* ¶ 21.

The court inquired into this issue during the hearing. After hearing the testimony of Allen Gunter, DOE's SRS Plutonium Program Manager, the court finds that the February 2002 SA studied using stabilization and packaging capability then existing in Building 235–F pending installation of the stabilization and packaging facilities at FB–Line. Consequently, Dr. Macfarlane's one specific concern was resolved.

Hodges' primary argument is that DOE overstepped the outer bounds of its discretion in deciding to rely on the 2002 SA to support the decision made in the April 19, 2002 ROD. This is because the 2002 SA expressly refers only to storage pending disposition (or "interim storage") and contains language concerning a period not likely to exceed twenty years. By contrast the April 19 ROD decouples storage and disposition, taking away a precondition to storage of Rocky Flats plutonium at SRS which had been found in all prior RODs (approval of SRS for the immobilization facility),[15] and makes SRS the location for long-term storage (for up to fifty years) of Rocky Flats surplus plutonium.

14. Most of Macfarlane's more specific concerns relate to potential impacts from the modified MOX procedure. These concerns are not, however, at issue as the MOX process is currently undergoing NEPA review.

15. Some, if not all, of the prior Records of Decision relating to transfer of the Rocky Flats plutonium to SRS placed as a precondition to transfer that SRS be approved as the site for the immobilization facility. *E.g.*, January 21, 1997 Record of Decision for the Storage and Disposition of Weapons–Usable Fissile Materials Final Programmatic Environmental Impact Statement, 62 Fed.Reg. 3014, 3027. *See also* July 1998 Supplement Analysis for Storing Plutonium in the Actinide Packaging and Storage Facility and Building 105–K at the Savannah River Site at 2 & 4 (recognizing that selection of SRS as the immobilization facility site is a precondition to shipment of plutonium from Rocky Flats). A subsequent decision approved SRS for three related disposition facilities: MOX, immobilization, and pit disassembly. *See* January 11, 2000, Record of Decision for the Surplus Plutonium Disposition Final Environmental Impact Statement, 65 Fed.Reg. 1608.

Certainly the April 19, 2002 ROD contains changes from the prior RODs, which contemplated only storage pending disposition, with the presumption that at least one (if not three) disposition technology facilities would be operated at SRS.[16] In fact, the last ROD to address disposition assumed that SRS would be the location for three disposition facilities: MOX processing, immobilization, and pit disassembly and conversion. *See* January 11, 2000, Record of Decision for the Surplus Plutonium Disposition Final Environmental Impact Statement, 65 Fed.Reg. 1608—Def. Ex. D. However, the query is not whether the planned program changed, but whether those changes present a "seriously different picture of the environmental impact of the proposed project from what was previously envisioned." *Hickory Neighborhood Defense League v. Skinner*, 893 F.2d 58, 63 (4th Cir.1990). This court concludes that they do not.

DOE has shown that it specifically analyzed the potential environmental impacts

The record does not reflect how this precondition came to be placed in the earlier RODs, but the court presumes it was a negotiated provision to allay South Carolina's fears that it might become the permanent repository for the surplus plutonium and, perhaps, to dissuade the State from opposing the decisions at issue. DOE has, itself, acknowledged the legitimacy of the State's presumed view that commitments had been made to it not to transfer surplus plutonium to SRS unless the State received the benefits associated with location of the processing facilities in the state. *See* DOE/NNSA Report to Congress, February 2002 at 3–5, 4–20, 4–25, 4–27 and 5–2. Presumably these benefits would be not only fiscal, but would provide some assurance that stored surplus plutonium would ultimately be removed from the state.

Be that as it may, Hodges' challenge to DOE's April 19, 2002 ROD is not premised on breach of a negotiated prior ROD or agreement not to challenge an earlier EIS, as likely it cannot be. It is premised on the legal inadequacy of NEPA compliance.

of long-term storage of surplus plutonium at SRS in its 1996 EIS, 1998 SA and 2002 SA. Hodges has failed to controvert DOE's detailed citations to the administrative record.

DOE notes, for instance, that the 1996 S & D EIS "analyzed the long-term storage of 'surplus' plutonium 'Pending Disposition'" with such storage to be accomplished "under both the National Academy of Science's 'Stored Weapons Standard' and DOE's 'Criteria for Safe Storage of Plutonium Metals and Oxides.'" Defendant's Reply at 4–5 (citing Def. Ex. B at S–2 to S–4). The storage standards at issue and impacts considered both addressed fifty-year periods. Defendant's Reply at 5 (citing Def. Ex. B at S–4, Def. Ex. H at 2–155 to 2–235, especially citing pages 2–166 & 2–170). This court agrees that the 1996 S & D PEIS studied long-term storage of surplus plutonium, including from Rocky Flats, for up to fifty years at SRS.[17]

16. There have, in fact, been such a complicated series of changes in the RODs since APSF was originally approved that it is difficult to keep them straight. After considering construction of the APSF in a 1995 ROD, and relying on expansion of that building for storage of the Rocky Flats plutonium in the 1996 EIS and 1997 ROD, then approving short term use of KAMS (pending construction of ASPF) through the July 1998 SA and August 1998 ROD, DOE then issued a November 1999 EIS which based portions of its analysis on the presumption that APSF might not ever be constructed. Following that, on January 11, 2000, DOE issued another ROD which selected SRS as the site for three disposition facilities: MOX, immobilization, and pit disassembly and conversion. It was the next ROD, published on January 26, 2001, that canceled APSF, replacing it with a patchwork of facilities. The net effect of use of those facilities was, however, considered in the February 2002 SA and adopted in the April 19, 2002 ROD.

17. At oral argument, Hodges did not appear to seriously dispute this contention or that

Likewise DOE directs the court to specific sections of the July 1998 SA which considered the same criteria for use of KAMS for up to ten years. Defendant's Reply at 6 (citing Def. Ex. I at 2–4 and K at 1 & 3–8). As to the critical inquiry, whether the February 2002 SA considered storage of up to fifty years, despite its reference to "interim storage" and its conclusion suggesting storage of up to twenty years, DOE points the court to various portions of the SA indicating that the impacts were studied for a period of fifty years. Defendant's Reply at 7 (citing Def. Ex. K at 5–7). While the references to "interim storage" and not expecting storage to exceed twenty years present some ambiguity as to the purpose for which the February 2002 SA was prepared, this court concludes, as discussed below, that DOE clearly did consider impacts over a fifty-year period. Thus, this court cannot conclude that DOE was arbitrary and capricious in determining that a new SA or SEIS was not required to support the April 19, 2002 ROD. Likewise, as discussed below, this court finds no basis for any claim that DOE was arbitrary and capricious in determining in either the July 1998 SA or the February 2002 SA that there were no different or greater impacts relative to the 1996 S & D PEIS requiring an SEIS. Moreover, in both the 1996 EIS and 1999 EIS, DOE determined that its storage strategy was not irrevocably dependent on the selection of a particular disposition strategy at any specific time.

When DOE's actual analysis is examined, it is clear that the fifty-year impacts of storage in general, and storage at KAMS, in particular, were examined. DOE performed a comparison between storage in its APSF facility (in the 1996 EIS), and in its KAMS facility (in the 1998

and 2002 SAs), sufficient to support its conclusion that the impacts of storing this material in the KAMS facility would not be significantly different from storing it in the APSF facility for a fifty-year period.

For these reasons the court concludes that there is no genuine issue of material fact and summary judgment is appropriate. DOE has adequately considered and disclosed the environmental impact of its actions and its decision is not arbitrary or capricious.

## II. HODGES' MOTION FOR PRELIMINARY INJUNCTION

Although the court has concluded that summary judgment on Hodges' Complaint is appropriate, it also considered whether a preliminary injunction would be appropriate if there were a likelihood of success on the merits.

■ Traditional equity principles govern the decision to grant or deny preliminary injunctive relief under NEPA. *Sierra Club v. Marsh*, 872 F.2d 497, 503–04 (1st Cir.1989); *Canal Authority of Florida v. Callaway*, 489 F.2d 567, 578 (5th Cir.1974); *Public Serv. Co. of Colo. v. Andrus*, 825 F.Supp. 1483, 1504 (D.Idaho 1993) (citing *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 542, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987)). Traditional equity principles require a court to consider four factors before determining whether a preliminary injunction should be granted or denied: (1) the likelihood of irreparable harm to the plaintiff if the preliminary injunction is denied, (2) the likelihood of harm to the defendant if the injunction is granted; (3) the likelihood that the plaintiff will succeed on the merits; and (4) the public interest. *See Safety–Kleen, Inc. (Pinewood) v. Wyche*, 274 F.3d 846, 858–59 (4th Cir. 2001); *Direx Israel, Ltd. v. Breakthrough*

adequate NEPA study was made of use of KAMS for at least the ten years addressed in

the July 1998 SA.

*Med. Corp.,* 952 F.2d 802, 812 (4th Cir. 1991).

## A. Likelihood of Irreparable Harm to Plaintiff

■ The Fourth Circuit requires that a district court consider first the likelihood of irreparable harm to the plaintiff if the preliminary injunction is denied. *See Safety–Kleen,* 274 F.3d at 859. A plaintiff must make a "clear showing" that he is likely to suffer irreparable harm if the preliminary injunction is denied. *See Multi–Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.,* 22 F.3d 546, 551 (4th Cir.1994) (internal quotations omitted). "Generally, 'irreparable injury is suffered when monetary damages are difficult to ascertain [with any accuracy] or are inadequate.'" *Id.* (citing *Danielson v. Local 275,* 479 F.2d 1033, 1037 (2d Cir. 1973)). In environmental cases, injury will often be irreparable because "[e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.,* irreparable." *Amoco Prod.,* 480 U.S. at 545, 107 S.Ct. 1396.

■ A fear of speculative or remote future injury cannot constitute irreparable harm. There must be a likelihood that immediate irreparable harm will occur. *See Manning v. Hunt,* 119 F.3d 254, 263 (4th Cir.1997) (quoting *Tucker Anthony Realty Corp. v. Schlesinger,* 888 F.2d 969, 975 (2d Cir.1989) (stating that the harm demonstrated by the plaintiff must be "neither remote nor speculative, but actual and imminent")); *Direx Israel,* 952 F.2d at 815–16 (holding that where there is no likelihood within a reasonably foreseeable time that injury may occur, preliminary injunction is premature). The rule barring consideration of remote or speculative injury for purposes of a preliminary injunction applies despite the degree of injurious consequences.[18] In the Fourth Circuit, moreover, it is especially important that a plaintiff show the current proposed stage of an action will cause irreparable injury to the environment. *See, e.g., S.C. Dep't of Wildlife & Marine Resources v. Marsh,* 866 F.2d 97, 100 (4th Cir.1989) (refusing to enjoin agency from installing generators for pump and treatment project, holding that only by operating and testing the generators would the agency be irreparably harming the environment).

■ A NEPA violation, if causing immediate, actual harm, however, should be

---

18. *See Mass. Coalition of Citizens with Disabilities v. Civil Defense Agency & Office of Emergency Preparedness,* 649 F.2d 71, 74–75 (1st Cir.1981) (finding specter of nuclear accident or attack by enemy power insufficient to constitute immediate irreparable harm); *New York v. NRC,* 550 F.2d 745, 756 (2d Cir.1977) (finding that "appellant ... failed to establish that there is any but the most remote of possibilities that an accidental crash of an airplane transporting [nuclear material] will occur or that, even if it did occur, the crash would result in the various catastrophic consequences appellant prophesies"), *superceded by rule on other grounds by Zervos v. Verizon, N.Y., Inc.,* 252 F.3d 163 (2d Cir.2001); *Crowther v. Seaborg,* 415 F.2d 437, 438–39 (10th Cir.1969) (finding no evidence that research project to study economic and technical feasability of using underground nuclear devices or explosives to generate natural gas was reasonably probable or reasonably likely to cause accident and therefore no irreparable harm); *Chem. Weapons Working Group, Inc. v. U.S. Dept. of the Army,* 963 F.Supp. 1083, 1095–97 (D.Utah 1997) (holding no irreparable injury where asserted risks of operation of facility for incineration of chemical warfare agents not likely). *But see Sierra Club v. Watkins,* 808 F.Supp. 852, 875–76 (D.D.C.1991) (finding risks associated with transportation of spent nuclear fuel significant until risks properly considered and warranted); *Andrus,* 825 F.Supp. at 1506–07 (finding that the uncalculated risks of repeated radiation exposure along transportation route for spent nuclear fuel along with consideration of its devastating impact irreparable harm).

considered in assessing the likelihood of irreparable harm to the plaintiff if the preliminary injunction is denied. *See North Carolina v. City of Virginia Beach,* 951 F.2d 596, 603 (4th Cir.1991) (recognizing that Fourth Circuit decisions have "favored injunctions when a NEPA review is required and has not been conducted") (citing *Arlington Coalition on Transp. v. Volpe,* 458 F.2d 1323, 1326 (4th Cir.1972) (enjoining highway construction pending Department of Transportation review)). Even in the NEPA context, the court must continue to balance traditional equity principles used to determine whether to grant or deny a preliminary injunction. In so doing, the court should take into account the fact that the harm created by a NEPA violation consists of the added risk to the environment that takes place when governmental decision makers make up their minds without having before them an analysis (with prior public comment) of the likely effects of their decision upon the environment. *See Sierra Club v. Marsh,* 872 F.2d 497, 500–01 (1st Cir.1989).

 Hodges claims that because DOE failed to follow the procedural requirements of NEPA, South Carolina will suffer irreparable harm without a preliminary injunction. Hodges contends that without NEPA compliance, South Carolina cannot be assured that the potentially devastating environmental effects of storing plutonium on a long-term basis at SRS have been fully considered. Plaintiff's Memorandum in Support of Motion, at 34–35. Hodges also claims irreparable harm because once the plutonium is shipped to South Carolina, it is unlikely to be removed. Hodges notes that DOE has not identified any other location that could take the plutonium. *Id.*

DOE argues that Hodges cannot show any irreparable injury. DOE asserts that procedural violations of environmental statutes alone cannot support a finding of irreparable harm. DOE also contends that Hodges must show that the alleged procedural NEPA violation would cause irreparable harm independent of the NEPA violation. Defendant's Consolidated Memorandum, at 44. Because Hodges allegedly cannot "establish an (sic) significant risk of any appreciable injury or (2) show that DOE and other federal safety, shipping, packaging, and containment standards would be or might be inadequate" if the plutonium is shipped to SRS, DOE concludes that Hodges cannot show irreparable harm. Defendant's Consolidated Memorandum, at 45. Finally, DOE claims that Hodges has not provided any "theory by which any plant population, animal population, human population, or any other aspect of the natural environment would be harmed irreparably by long-term storage at SRS." *Id.*

The court concludes that Hodges has failed to make a clear showing of the likelihood of irreparable harm without the requested preliminary injunction. First, the court has concluded in section I above that there is no likelihood that Hodges will be able to establish a NEPA violation. Assuming, however, there were a NEPA violation, such a violation alone would not create a presumption in favor of an injunction. *See S.C. Dept. of Wildlife & Marine Resources v. Marsh,* 866 F.2d 97, 100 (4th Cir.1989).

Hodges argues that irreparable harm is present here because once the plutonium is shipped here it will not be removed. Hodges is likely correct in concluding that, absent approval of the new MOX process,[19]

---

19. At oral argument, Hodges conceded that his objection was not to storage pending disposition, at least if the disposition facilities were to be located at SRS. In fact, his counsel conceded that if storage in KAMS was limited to the ten years addressed in the July 1998 SA, DOE could "bring it on." (Tr. p. 35)

once the plutonium is shipped to and stored in South Carolina, changing the course of action, such as shipping and storing the plutonium at another location, is impracticable. *See, e.g., Marsh,* 872 F.2d at 500–01 (stating that difficulty of changing the proposed course of action once started is a proper irreparable harm to consider on a motion for preliminary injunction); *Andrus,* 825 F.Supp. at 1505 (same). DOE has not identified any alternative location to store the plutonium. Moreover, opposition to shipment of plutonium for long-term storage without disposition to another site is reasonably likely. Such opposition would further diminish any chance the plutonium could practicably be transported and stored at another DOE facility. Thus, Hodges will suffer some harm if the court denies the preliminary injunction.

The extent of harm caused by the irreversible nature of the shipment of the Rocky Flats plutonium to SRS, however, is slight. As established at the hearing, SRS currently stores approximately two metric tons of surplus plutonium. The two tons already stored at SRS have not yet been stabilized and packaged. In contrast, Rocky Flats surplus plutonium will be stabilized and packaged at Rocky Flats before it is shipped to SRS. In fact, this process began in June 2001 in anticipation of the proposed shipments to SRS. As this court noted in its oral ruling, "It is very difficult to establish irreparable harm when the plutonium you will be receiving is obviously in a safer condition than the plutonium you already have." Tr. p. 174. Accordingly, the court concludes that

Hodges has failed to make a clear showing of irreparable harm.

### B. Likelihood of Harm to Defendant

 After considering the likely irreparable harm to the plaintiff if the preliminary injunction is denied, the court should consider the likelihood of harm to the defendant if the preliminary injunction is granted. *See Safety–Kleen,* 274 F.3d at 859. Increased costs caused by a proposed injunction are properly considered as harm to the defendant. *See Quince Orchard Valley Citizens Assoc., Inc. v. Hodel,* 872 F.2d 75, 79 (4th Cir.1989); *Coalition for Responsible Reg'l Dev. v. Brinegar,* 518 F.2d 522, 527 (4th Cir.1975) (finding that delay in bridge construction increasing total cost was harm to defendant). Any adverse national security or foreign policy consequences are accorded great weight when balancing the equities of the parties. *See generally South Carolina ex rel. Campbell v. O'Leary,* 64 F.3d 892 (4th Cir.1995).[20]

### 1. DOE's Arguments as to Harm to DOE Caused by Injunction

DOE argues that foreign policy and national security interests will be harmed if the court grants a preliminary injunction. DOE also claims that any delay in the immediate commencement of shipments of plutonium from Rocky Flats to SRS will cause it to incur substantial additional costs and interfere with the important, efficient, and timely environmental cleanup at Rocky Flats.

---

**20.** *See also Wisconsin v. Weinberger,* 745 F.2d 412, 427 (7th Cir.1984) (considering harm to national defense one of the most important factors to be weighed); *Nat'l Res. Defense Council, Inc. v. Pena,* 972 F.Supp. 9, 20 (D.D.C.1997) (holding national security interest paramount) (citing *Comm. for Nuclear Re-*

*sponsibility v. Seaborg,* 463 F.2d 796, 798 (D.C.Cir.1971) (holding that because of "assertions of potential harm to national security and foreign policy" the court is constrained to refuse injunction despite paucity of record before it)).

### a. Foreign Policy Interests

Insofar as foreign policy interests are concerned, DOE refers the court to the United States and Russian Federation's *Agreement ... Concerning the Management and Disposition of Plutonium Designated As No Longer Required for Defense Purposes and Related Cooperation* (hereinafter "the U.S.-Russian Nonproliferation Agreement" or "the Agreement") where the two Parties agreed "to each dispose of 34 metric tons of plutonium pursuant to certain agreed-upon schedule and timing milestones." Defendant's Consolidated Memorandum, Ex. N (Declaration of Linton F. Brooks), ¶ 5. DOE claims that an injunction preventing DOE from immediately commencing shipments of plutonium from Rocky Flats to SRS could create the appearance "in the eyes of the Russian Federation" that the United States is uncertain about its commitment to the U.S.-Russian Nonproliferation Agreement's disposition strategy, and, in turn, call into question the Russian Federation's willingness to proceed with disposing of its own materials under the agreement. *Id.* ¶ 9. Specifically, DOE points out that both the United States and the Russian Federation decided to use MOX technology as their preferred method of disposition under the Agreement. Further, DOE notes that SRS was chosen as the DOE facility to (1) consolidate and store surplus Rocky Flats plutonium on a long-term basis subject to MOX disposition, and (2) build any applicable MOX facilities. *See id.* ¶ 9; Defendant's Consolidated Memorandum, Ex. G, at 4, 13 (2000 Agreement), and at 2, 4, 6 (1998 Agreement). Considering these nonproliferation goals of secure storage and eventual disposition of surplus plutonium, DOE asserts that the "secure long-term storage of surplus plutonium at SRS is a practical safety and security prerequisite for any eventual disposition, under the [United States and Russian Federation's] Agreement, of all or part of that plutonium under the MOX program." Defendant's Consolidated Memorandum, at 46; Ex. A, at 3023–3024. Any significant delay in the storage part of DOE's surplus plutonium strategy could create "international uncertainty" and "kill" the Agreement by discouraging Russia from carrying out its reciprocal acts under the Agreement. Defendant's Consolidated Memorandum, at 47.

DOE points out that the United States is scheduled to begin the "excavation" of any "MOX Fuel Fabrication Facility" by October 2003. Correspondingly, the Russian Federation is scheduled to (1) complete a test-fuel line for MOX assemblies by October 2002, and (2) begin constructing an industrial-scale MOX conversion facility by July 2003. Defendant's Consolidated Memorandum, Ex. A, at 1–2 (Annex on Schedules and Milestones).

DOE submits an affidavit Linton F. Brooks, Deputy Administrator for Defense Nuclear Nonproliferation, National Nuclear Security Administration, DOE, who states that:

> actual or apparent delay in any aspect of the U.S. program, such as the uncertainty associated with a prolonged delay in the shipment of plutonium destined for the MOX program, could lead the Russian leadership to reconsider its support for the current approach. At best, this would delay the implementation of the program ... [c]onceivably, it could kill the program because success depends on each side believing that the other side is in engaging in reciprocal nonproliferation efforts.

Defendant's Consolidated Memorandum, Ex. N, ¶¶ 9, 14. Ambassador Brooks further avers that the United States' failure to comply with the Agreement "would [also] call into question our commitment to other nonproliferation efforts and diminish our credibility in continuing to provide

leadership on these issues internationally." *Id.* ¶ 16.

In addition, DOE emphasizes that the disposition of the Russian Federation's plutonium is "critically important to national and international security interests because it is sufficient 'to make at least 4,250 nuclear weapons.'" *Id.* ¶ 14. If the Russian Federation delayed implementation of its nonproliferation disposition strategy as a result of its uncertainty about United States compliance, then congressional funding also critical to United States compliance and the Agreement's success could be threatened. *Id.* ¶ 14.

### b. National Security Interests

DOE claims that consolidating surplus plutonium at SRS will help to enhance national security by decreasing the number of plutonium storage facilities and provide DOE "with the security and scale economies necessary to maximize the effectiveness of its domestic security resources." Defendant's Consolidated Memorandum, at 48 & Ex. O, ¶ 10 (quoting Affidavit of Joseph Mahaley, Director of Security for the U.S. Department of Energy). DOE urges that consolidation of surplus plutonium storage facilities is more cost-effective and efficient and " 'provide[s] greater protection against the threats of theft and sabotage, both quantitatively and qualitatively, if our security resources are focused on fewer sites.' " *Id.* ¶ 10.

### c. Costs and Delay in Rocky Flats Clean-up

DOE also claims that an injunction would delay the closing and clean-up of Rocky Flats and cause substantial additional costs to be incurred. DOE estimates that closing the Rocky Flats storage facility by 2006 instead of 2010 will save

approximately $440 million per year and approximately "$1.2 million per day." Defendant's Consolidated Memorandum, at 49 n. 13 & Ex. Q at ¶ 18; *see also id.* Ex. I, at 1, 3, 6, 8–9, 24.

In addition, DOE stresses the importance of cleaning-up Rocky Flats by 2006. DOE states that in 1989 Rocky Flats was placed on the Superfund National Priorities List. In 1992, DOE permanently shut down nuclear weapons work at the Site. *Id.* ¶ 12. Congress and DOE then specifically selected Rocky Flats, as "the centerpiece of a newly refocused clean-up program that would concentrate on reducing public and environmental risks by 2006 ... in order to pave the way for remaining sites." [21] Defendant's Consolidated Memorandum, Ex. Q, ¶¶ 9–10, 13. "The Rocky Flats Cleanup Agreement [moreover] establishes a legally binding relationship between DOE, EPA and the Colorado Department of Public Health and Environment that governs cleanup of the site." Defendant's Consolidated Memorandum, Ex. E, at 4–12. DOE contends that failure to remove the plutonium from Rocky Flats by November 2003 will seriously jeopardize DOE's ability to close the Rocky Flats site under the Rocky Flats Clean-up Agreement by the end of 2006. DOE specifically describes how a delay in removal of plutonium at the site could also delay "remediation of significant quantities of contamination in and around the facility where the [plutonium] is currently stored." *Id.* Ex. Q, ¶ 16.

### 2. Hodges' Arguments as to Harm to DOE Caused by Injunction

Hodges argues that foreign policy and national security interests are not overriding considerations in this case. Fur-

---

**21.** This selection was based on Rocky Flats' proximity to a major metropolitan area with encroaching suburbs and commercial facilities, its history as a major weapons production facility, and its enormous upkeep costs,

thermore, Hodges disputes that any substantial additional costs will be incurred in the event the court grants a preliminary injunction and delays the shipment of plutonium from Rocky Flats to SRS.

### a. Foreign Policy Interests

As to DOE's foreign policy interests, Hodges argues that an injunction preventing the shipment of plutonium from Rocky Flats to SRS for long-term storage will not harm the U.S.-Russian Nonproliferation Agreement or any foreign policy goals for disposition of plutonium. Rather, Hodges argues that DOE's decision to ship the surplus plutonium at Rocky Flats to SRS for long-term storage without a plan for disposition actually jeopardizes national security interests. Hodges focuses on the U.S.-Russian Nonproliferation Agreement mandate to dispose of plutonium. Hodges contends the agreement does not envision long-term storage of plutonium. Rather, because DOE has abandoned all plans to dispose of the plutonium designated for shipment to SRS, either through immobilization or MOX, Hodges contends that an injunction preventing the immediate shipment of plutonium for long-term storage at SRS will not implicate the U.S.-Russian Nonproliferation Agreement governing plutonium disposal. Plaintiff's Reply, at 22, 24–26, Ex. C. ¶ 3 (Macfarlane II); Plaintiff's Memorandum, Ex. 1, ¶ 35 (Macfarlane I).

In addition, Hodges argues that any delay in the shipment of plutonium from Rocky Flats to SRS at this time will not risk the United States' ability to comply with its plutonium disposition deadlines under the U.S.-Russian Nonproliferation Agreement. Hodges' expert, Dr. Macfarlane, avers that the U.S.-Russian Nonproliferation Agreement does not contain any schedules or deadlines for moving plutonium from one facility to another for long-term storage. Rather, Dr. Macfarlane observes that the Agreement provides "only

rough milestones for the construction and operation of the disposition facilities." Plaintiff's Reply, Ex. C, ¶ 8 (Macfarlane II). Dr. Macfarlane further explains that construction of facilities to process plutonium has not begun and will not be completed and ready to process plutonium until 2006 or 2007 at the earliest. Hodges notes that DOE has yet to finalize any plan to process plutonium at all, much less to design and construct the processing facility. *Id.* ¶ 7 (citing Annexes to Agreement of the United States and the Government of the Russian Federation Concerning the Management and Disposition of Plutonium Designated as No Longer Required for Defense Purposes and Related Cooperation, September 1, 2000). Hodges, therefore, contends that any delay in the shipment and storage of plutonium will not implicate the U.S.-Russian Nonproliferation Agreement or any U.S. foreign policy regarding disposition of plutonium.

Finally, Hodges alleges significant reasons independent of this litigation have caused delays under the U.S.-Russian Nonproliferation Agreement. Thus, Hodges argues that the reaction, if any, of the Russian Federation to a perceived delay caused by a preliminary injunction stopping shipments, would be slight. Unless the Russian Federation is able to obtain at least $2 billion dollars in the next year or so, Hodges asserts that the plutonium disposition program will be delayed. Plaintiff's Memorandum, Ex.1, ¶ 31(citing Macfarlane I). Further, Hodges contends that the lack of an available and ready MOX fuel fabrication facility further exacerbates the Russian Federation's inability to comply with the U.S.-Russian Nonproliferation Agreement. Hodges states that last year the Russian Federation failed to realize its funding for the available and ready MOX facility it planned to buy. Since last winter, the company that owned that available and ready MOX facility has begun to decommission it. *Id.* ¶ 32. In

addition, Hodges contends that disagreement between the United States and the Russian Federation over the United States' abrogation of the Antiballistic Missile Treaty and the Unites States' development of a national missile defense have made it less likely that the Russian Federation will move quickly on plutonium disposition. *Id.* Hodges submits, finally, that the United States' disposition program is in doubt. Both the Nuclear Regulatory Commission, which must license any MOX facility, and Duke Energy, the only remaining company which has agreed to use its reactors burn the MOX fuel, have expressed doubts about DOE's current plutonium disposition program. *Id.* ¶ 33.

### b. National Security Interests

Distinguishing the circumstances found in *South Carolina ex rel. Campbell v. O'Leary,* 64 F.3d 892 (4th Cir.1995), Hodges contends that national security interests are not overriding in this case. In *O'Leary,* the Fourth Circuit reversed the district court's decision to enjoin the shipment of nuclear fuel rods that were in urgent need of shipment for foreign policy and national security reasons. At the time the case was heard, the nuclear fuel rods were already aboard ship in the Atlantic Ocean headed for the United States. Hodges asserts that similar urgent, concrete foreign policy and national security interests are not present in this case. Hodges contends that in *O'Leary DOE* had real concerns about the security of nuclear material, vulnerable to theft and sabotage while located in foreign countries and also en route across the Atlantic to the United States. In this case, however, Hodges argues that the plutonium DOE plans to ship from Rocky Flats to SRS is already under secure U.S. control. Plaintiff's Reply, at 22. Hodges asserts that the plutonium is actually more secure at Rocky Flats which has a stabilization and packaging facility to deal with potential leaks and accidents. Although Hodges recognizes that DOE has stated that packaging and stabilization facilities will be available at SRS, Hodges claims that DOE has not yet confirmed that such facilities are or will be completed in the near future. Without packaging and stabilization facilities, Hodges argues that it is not clear how DOE will safely store plutonium on a long-term basis. Plaintiff's Memorandum, Ex. 1, ¶ 27 (Macfarlane I). Hodges also points to Dr. Macfarlane's testimony that even if all the plutonium DOE currently plans on storing at SRS by November 2003 is shipped now, allegedly to clear the way for other clean-up activities necessary to close Rocky Flats by 2006, substantial nuclear materials will remain at Rocky Flats. Plaintiff's Reply, Ex. B, ¶ 13–15. Hodges claims that if surplus plutonium remains at Rocky Flats after shipment of Rocky Flats's surplus plutonium to SRS, then surplus plutonium will not be consolidated at fewer sites and national security interests will not be enhanced.

### c. Costs & Delay in Rocky Flats Clean-up

Hodges argues that substantial nuclear materials will remain at Rocky Flats even after DOE ships the proposed six metric tons of surplus plutonium to SRS. Plaintiff's Reply, Ex. C, ¶¶ 13–15 (Macfarlane II). Hodges points out that to realize substantial savings DOE must remove nearly all of its stored nuclear materials at Rocky Flats. Because substantial nuclear materials will be left at Rocky Flats after this proposed shipment, thereby preventing DOE's realization of substantial savings, Hodges argues that DOE will not incur any monetary harm if the court grants this injunction.

### 3. Court's Analysis of Harm to DOE if Injunction Granted

The court concludes that significant harm to DOE would result from a grant of

preliminary injunctive relief. Although the court finds the most significant harm to be the inevitable delay in the close down and clean up of Rocky Flats, the court's analysis below proceeds in the order in which the parties briefed the issues.

### a. Harm to Foreign Policy Interests

Great deference is be accorded executive branch decisions regarding foreign policy and national security interests. Based upon the undisputed evidence, however, the court must view with some skepticism DOE's claim that foreign policy interests will be seriously harmed if the court grants a preliminary injunction in this case.

Perhaps the most pointed evidence contradicting DOE's claim that U.S. foreign policy interests will be harmed if the court grants the injunction in this case are DOE's own admissions to Congress. DOE acknowledged in February 2002 that a decision to consolidate surplus plutonium for long-term storage would turn the U.S.-Russian Nonproliferation Agreement on its head. In a report addressed to Congress on February 15, 2002, DOE stated:

> [The long-term storage option without disposition] does not achieve the U.S. plutonium disposition mission and it renounces the U.S.-Russian PMDA.... Russia would have no incentive to complete disposition of its surplus plutonium. This option would represent a reversal of the U.S. position on disposition of surplus plutonium, be derided inter-

nationally, and be opposed by states and the public.

NNSA Report, ch. 4, at 27 (report filed in response to congressional directive to Department of Energy to provide, not later than February 1, 2002, a plan for disposal of surplus defense plutonium currently located at SRS and to be shipped to SRS in the future).[22] Considering DOE's admission to Congress, it is difficult to believe that a delay in shipping Rocky Flats surplus plutonium to SRS for long-term storage (which is what the April 19, 2002 ROD addresses) would cause great harm to the Nonproliferation Agreement.

In addition, the evidence demonstrates that delaying the shipment of plutonium at this time would not place the United States' ability to comply with its disposition deadlines under the U.S.-Russian Nonproliferation Agreement at risk. According to DOE's own latest schedule, construction of facilities to process plutonium have not yet begun and will not be completed or ready to process plutonium until 2006 or 2007 at the earliest. In fact, DOE has not yet even finalized any plan to process plutonium. Without a plan to process the plutonium designated for long-term storage at SRS at this time, it is not rational to argue that this injunction will significantly harm U.S. foreign policy interests concerned only with plutonium disposition. However, because the court is required to defer to Ambassador Brooks' conclusion that such an injunction would likely cause some potential, adverse impact on the Russian Federation's *perception* of

---

**22.** Other portions of the Report similarly stress that:

> [a] long-term storage option would renounce the existing U.S.-Russian PMDA. A storage strategy would also be viewed by Russia ... as a reversal of a long-standing U.S. position advocating the need to disposition surplus inventories of weapons-grade plutonium .... and would likely put an end to Russian efforts to dispose of surplus Rus-

sian plutonium. Renouncing the PMDA is also likely to have negative secondary impacts on key aspects of other U.S.-Russian nonproliferation programs, such as monitoring and inspection of the Mayak Fissile Material Storage Facility, the Trilateral Initiative, and cooperation on Materials Protection and Control efforts.

NNSA Report, ch. 4, at 27, ch. 5, at 2.

U.S. compliance with the U.S.-Russian Nonproliferation Agreement, the court does find that some harm to foreign policy interests could result from the grant of an injunction.

#### b. Harm to National Security

DOE argues that consolidation of surplus plutonium would enhance national security by making it more cost-effective and efficient, and also reducing the number of potential enemy targets. Consolidation of surplus plutonium would appear, as DOE contends, to "provide *greater* protection against the threats of theft and sabotage, both quantitatively and qualitatively, if our security resources are focused on fewer sites." Defendant's Memorandum, Ex. N, at 10. (emphasis added).

Dr. Macfarlane, however, suggests that even if all the plutonium DOE currently plans on storing at SRS is shipped by November 2003, substantial nuclear materials will remain at Rocky Flats. Plaintiff's Reply, Ex. B ¶ 13–15 (Macfarlane II). This contention was fully aired at the hearing, and the court finds that there is no support for Dr. Macfarlane's unsupported speculation that substantial nuclear materials will remain at Rocky Flats after November 2003. In fact, Hodges did not challenge the testimony of Paul Golan, Chief Operating Officer, Environmental Management, DOE, that substantial nuclear materials will not remain at Rocky Flats after November 2003. Apparently Dr. Macfarlane was under the impression that the current amount of surplus plutonium at Rocky Flats exceeds the six metric tons to be shipped to SRS. Golan's testimony demonstrated that this is an incorrect impression.[23]

An additional national security consideration is the disruption to the country's weapons transportation schedule which would occur if a delay in surplus plutonium shipments occurs. *See* Affidavit of Everett H. Beckner (addressing nation's "Secure Transportation Asset" (STA) capabilities). Def. Ex. P at §§ 9–16. Beckner's affidavit establishes that any delay will cause disruption beyond simply the transport of the Rocky Flats plutonium: the longer the delay, the greater the disruption. Hodges offers no evidence to the contrary. In addition, Mr. Golan testified at the hearing that further delay in implementation of the schedule of shipments will impact required transportation of national defense shipments. (Tr. 122–23).

#### c. Substantial Additional Costs and Delay in Rocky Flats Clean-up

A delay in the shut down and clean-up of Rocky Flats is likely to cause DOE substantial additional costs. Jessie Hill Roberson, Assistant Secretary for Environmental Management, attests that the process of shutting down and cleaning up of Rocky Flats by 2006 will likely save approximately $440 million per year, or about $1.2 million per day. Defendant's Consolidated Memorandum, Ex. Q, ¶ 18.

The court finds that a delay in the shut down and clean-up of Rocky Flats is the most significant harm to DOE in this case. Clearly, DOE is bound to clean up Rocky Flats on a timetable. *Id.* ¶¶ 9–10, 12–13, 16, 18; Ex. E, at 4–12. Any delay in removing the plutonium is likely to delay closing down and cleaning up the site. Granting an injunction in this case would, therefore, harm DOE's ability to meet its obligations both within its financial and time constraints.

---

**23.** According to Golan, the only plutonium which will remain after the shipment of the surplus weapons-grade plutonium to SRS is plutonium which will be removed as contamination or waste. Tr. 113–114 & 123–24.

### d. Disruption of Planned Activities at SRS

Based on the testimony of Allen Gunter of SRS, as well as information on upgrades of SRS facilities in the February 2002 SA, the court finds that substantial preparations in terms of facilities and manpower have been made at SRS. The court finds that an injunction would alter SRS's scheduled activities to some extent, causing some degree of disruption to DOE.

### e. Conclusion as to Harm to Defendant

Based on the undisputed evidence, therefore, the court concludes that the harms to DOE if an injunction is granted are significant. Such harms include adverse national security and foreign policy consequences.

### C. Balance of Harms to Parties

After identifying the likelihood of harm to the parties if the preliminary injunction is granted or denied, the court should then determine whether the balance of harm "tips decidedly in favor of the plaintiff," tips in favor of the defendant, or is about equal. *See Safety–Kleen,* 274 F.3d at 859 (citing *Blackwelder Furniture Co. v. Seilig Mfg. Co.,* 550 F.2d 189, 195 (4th Cir.1977)); *see also Direx Israel,* 952 F.2d at 817. When balancing monetary costs against the loss to the human environment and general public, the Fourth Circuit has upheld a district court's finding that environmental harm overrides monetary harm. *See S.C. Dept. of Wildlife & Marine Resources,* 866 F.2d at 100 (finding district court did not clearly err in concluding that the potential harm to the defendant from an injunction, which would be substantially higher costs, "by no means equates to the loss the environment and general public will suffer if the fisheries at the [Dam] are lost"); *see also Sierra Club v. Marsh,* 714 F.Supp. 539, 592 (D.Me.1989) (finding that harm of NEPA violation outweighed substantial increased costs of injunction), *amended on other grounds by* 744 F.Supp. 352 (D.Me. Nov.1, 1989), *aff'd,* 976 F.2d 763 (1st Cir.1992).

For the reasons discussed above, the court finds that the likelihood Hodges will suffer irreparable harm if the court denies the preliminary injunction is low. The court assigns some weight to Hodges' contention that DOE's decision to store plutonium in South Carolina on a long-term basis without any plan for disposition would cause irreparable harm, at least to the extent that it is possible the plutonium might never be processed and removed. In addition, because DOE is making decisions regarding nuclear materials with potentially devastating and deadly consequences, the court recognizes the heightened importance of ensuring that DOE complies with NEPA before taking action.

On the other hand, for the reasons set forth above, DOE has established that foreign policy and national security interests could be harmed by an injunction. Further, DOE has demonstrated that a delay in the shipment of plutonium from Rocky Flats to SRS would likely cause DOE to lose substantial additional cost savings, and would likely interfere with DOE's ability to meet its legally binding deadline to clean up Rocky Flats. A delay would constrain DOE's ability to complete the cleanup with the money Congress appropriated for this environmentally significant project.

After balancing the harms to the parties, the court concludes that the harms to DOE outweigh the harm to Hodges even if a NEPA violation were present. It should be noted that the shipment schedule encompasses an eighteen month period. Should a NEPA violation be found by a reviewing court within the next few months, only a small percentage of the

shipments will have occurred. Considering that SRS already stores approximately two metric tons of unstabilized plutonium, it is difficult to conclude that the harm to Hodges from the arrival of a few shipments of stabilized plutonium warrants an urgent need for a preliminary injunction pending final review of the NEPA issue.

### D. Likelihood of Success on the Merits

For the reasons set forth in Section I above the court concludes that Hodges is unable to establish that he is likely to succeed on the merits. Because Hodges has failed to make a clear showing of irreparable harm, he must establish by clear and convincing evidence that he is likely to succeed on the merits. This he cannot do. Thus even if a "substantial question" were presented, *Smyth v. Rivero*, 282 F.3d 268, 276 (4th Cir.2002) (citing *Safety–Kleen*, 274 F.3d at 859), this court would deny the motion for preliminary injunction due to the failure of Hodges to make a clear showing of irreparable harm.

### E. Public Interest

The public interest is the final factor to consider in determining whether to grant or deny a preliminary injunction. Generally, the public interest is best served when an injunction is granted in favor of the party suffering the most harm by the denial or grant of the injunction. *See, e.g., Wisconsin v. Weinberger*, 745 F.2d 412, 426 (7th Cir.1984) (finding that even if there had been a NEPA violation, traditional equity principles militated against granting preliminary injunction because potential harm to Navy and national defense outweighed harm to the environment).

### F. The Equitable Balance

After considering each factor separately, the court must consider the equitable balance of the factors construed together.

*See Ciena Corp. v. Jarrard*, 203 F.3d 312, 323 (4th Cir.2000) (stating that "once a court has performed these separate analyses, it must then make the equitable determination whether to grant injunctive relief"). Considering the findings above, and that interim relief is "an extraordinary remedy involving the exercise of a very far-reaching power, which is to be applied only in limited circumstances which clearly demand it," *Direx Israel*, 952 F.2d at 811 (internal quotations omitted), the court concludes that a preliminary injunction is unwarranted.

### CONCLUSION

**IT IS THEREFORE ORDERED** that DOE's motion for summary judgment is **GRANTED** and Hodges' motion for a preliminary injunction is **DENIED.**

**IT IS SO ORDERED.**