Spencer **ABRAHAM**, Secretary of the Department of Energy, in his official capacity, and the United States Department of Energy, Plaintiffs,

v.

Jim **HODGES**, Governor of the State of South Carolina, in his official capacity, Defendant.

C/A No. 1:02–2078–22.

United States District Court, D. South Carolina, Aiken Division.

June 20, 2002.

See also 300 F.3d 432.

Christie Newman Barrett, Robert F Daley, Jr., Columbia, SC, for Plaintiffs.

Lionel S. Lofton, Lofton Law Firm, Charleston, SC, Stephen Potts Bates, Columbia, SC, for Defendant.

MEMORANDUM OPINION AND ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND ENTERING PERMANENT INJUNCTION AGAINST GOVERNOR HODGES

CURRIE, District Judge.

## INTRODUCTION

This case presents a question which can be easily resolved by reference to a rather well known decision issued by the United States Supreme Court in 1819: *McCulloch v. Maryland,* 17 U.S. (4 Wheat.) 316, 4 L.Ed. 579 (1819).[1] In that case, the Supreme Court addressed what is generally referred to as the "Supremacy Clause" of the United States Constitution (art. VI, § 2), which establishes the relationship between the states and the federal government:

> The court has bestowed on this subject its most deliberate consideration. The result is a conviction that the states have no power ... to retard, impede, burden, or in any manner control, the operations of the constitutional laws enacted by congress to carry into execution the powers vested in the general government. This is, we think, the unavoidable consequence of that supremacy which the constitution has declared.

*Id.* at 326–27.

As discussed below, the basic principle announced in *McCulloch* has been reaffirmed again and again in various contexts over the ensuing 183 years. One would,

therefore, have assumed that this principle would not need further explanation, and that it would have been clear that the effect of the Supremacy Clause, among various other doctrines discussed herein, was to preclude persons acting on behalf of a state from physically interfering with federal authorities in lawful pursuance of their duties. Developments since this court's ruling on a related matter, however, suggest otherwise. Thus, while this court would not normally write or publish a detailed decision on a clearly established area of the law, it feels compelled to do both in this case.[2]

This matter came before the court on Plaintiffs' motions for a temporary restraining order (TRO), preliminary injunction, and summary judgment. Oral argument on these motions was heard on June 18, 2002. At that time, Defendant waived his right to file an Answer or submit written opposition to the motions. He further agreed that this action could be resolved on summary judgment on the then-existing record and conceded that he had no legal or factual arguments to present in opposition to Plaintiffs' motions. Tr. at 4–5.

Based on this record and for the reasons discussed below, this court ruled orally granting Plaintiffs' motion for summary judgment and entering a permanent injunction against Defendant and others acting in concert with him. The court entered a written order memorializing these rulings at the conclusion of the hearing.[3] This memorandum opinion sets forth the

---

**1.** This court says "well known" because the decision is one of the first two cases that are usually taught in the basic Constitutional Law course at most law schools.

**2.** This opinion should not be read to question the decision of a governor, or any other individual, to seek redress through the courts where the propriety of federal agency action is questioned. Neither should it be read to challenge attempts by state officials to gain

assurances or benefits on behalf of their state through negotiation with an executive branch agency or through legislation. What is at issue here is the use of a self-help remedy of physical interference with federal action.

**3.** The entry of summary judgment and issuance of a permanent injunction mooted the motions for a temporary restraining order and for a preliminary injunction.

reasons for the order entered at the conclusion of the hearing.

## BACKGROUND

The present action was filed on June 17, 2002. The issues were, however, previously presented to the court through a counterclaim to the action styled *Hodges v. Abraham*, C.A. No. 1:02–1426–22, 2002 WL 32068168. A proper understanding of the present action (*Abraham v. Hodges*, 2002 WL 32068167 ), therefore, requires an understanding of the earlier action *(Hodges v. Abraham)*.

### 1. Record developed in *Hodges v. Abraham*

The earlier action was filed on May 1, 2002, by Jim Hodges, the Governor of the State of South Carolina (Hodges), challenging the Department of Energy's April 19, 2002 Record of Decision (ROD). That ROD authorized use of the Savannah River Site (SRS), which is located in South Carolina, for long-term storage of surplus weapons-grade plutonium which is currently stored at the Rocky Flats Environmental Technology Site (RFETS or Rocky Flats) in Colorado. Hodges argued, *inter alia*, that the challenged ROD was invalid because DOE had not complied with the requirements of the National Environmental Policy Act, 42 U.S.C. §§ 4321–4370d (NEPA). Both the Secretary of the Department of Energy and the Department itself (collectively DOE) were named as Defendants.

. Hodges filed a motion for a preliminary injunction in the earlier action on May 16, 2002, seeking to prevent any shipments of the Rocky Flats plutonium to SRS until the action could be resolved on its merits. DOE answered and filed a counterclaim on May 24, 2002. That counterclaim sought a declaratory judgment that any attempt by Hodges to interfere by physical means with the shipments would be in violation of the United States Constitution. DOE moved for summary judgment on the counterclaim on the same date. Several days later, on May 28, 2002, DOE filed a motion for summary judgment on the complaint.

DOE's motion for summary judgment on the counterclaim in *Hodges v. Abraham*, 2002 WL 32068168 was supported by a lengthy memorandum citing extensive legal authority in support of DOE's position that any attempt by Hodges to interfere by physical means with federal shipments of plutonium would be unlawful. DOE argued that any attempt to impede the transportation and storage of plutonium would violate (1) the Commerce Clause of the United States Constitution, art. I, § 8, cl. 3, and (2) the Supremacy Clause of the United States Constitution, art. VI, § 2, and (3) would be preempted as inconsistent with the provisions of the Atomic Energy Act of 1954, 42 U.S.C. § 2011 *et seq.* (AEA).

DOE also provided substantial factual support for its position that the risk of interference by Hodges was more than hypothetical, and, thus, presented a justiciable controversy. For instance, DOE provided evidence that, prior to institution of this action, Hodges had publicly announced an intent to utilize a blockade to stop the shipments at issue. DOE also provided evidence that Hodges had continued to publicize his intent to take such action through the State's web site and otherwise.[4] Finally, DOE provided evidence, in

4. *See* Declaration of Robert F. Daley, Jr., ¶ 4, Ex. C.1 to DOE's Motion for Summary Judgment on the Counterclaim in *Hodges v. Abraham*. ("On May 21, 2002, I recorded on videotape a commercial that was broadcast on NBC on that date. That commercial … states that Governor Hodges is fighting to keep plutonium out of South Carolina, 'even if it means a blockade.' "); Declaration of James M. Gaver, Ex. D to DOE's Motion for Summary Judgment on the Counterclaim in *Hodges v. Abraham* (citing and attaching numerous articles supporting the inference that

the form of correspondence between counsel for the parties, demonstrating that, even after filing an action seeking a judicial ruling on the legality of the shipments, Hodges would not concede that he would not take action to interfere by physical means with the shipments should the court rule against him.

This exchange of letters was initiated by the United States Attorney's office which inquired, as follows, of Hodges' attorney: "I request that you inform me whether the Governor will obstruct or impede the shipment of any surplus plutonium [from Rocky Flats to SRS] if the Governor's Motion for Preliminary Injunction is denied." Letter by Robert F. Daley Jr. to William L. Want, May 8, 2002 (Ex. C.1. to DOE's Motion for Summary Judgment on the Counterclaim in *Hodges v. Abraham*, 2002 WL 32068168 ). Hodges' counsel responded:

> Unless a legally enforceable agreement is in place requiring [DOE] to convert and/or remove any plutonium shipped to South Carolina, *the Governor expressly reserves the right to rely upon any and all lawful means available* to him in his capacity and under his authority, as the Governor of the State of South Carolina *to prevent [DOE] from shipping any surplus plutonium to South Carolina.*

Letter by Want to Daley (May 10, 2002) (*Id.* at Ex. C.2.).

Hodges responded to DOE's motion for summary judgment on the counterclaim on May 31, 2002, arguing that the motion was premature.

> Hodges was actively publicizing an intent to interfere by physical means with the shipments of plutonium through April 2002 and possibly as late as May 18, 2002—the latest item was a May 18, 2002 CNN Headline News Broadcast excerpt stating, *inter alia*, that "Hodges says he'll lie down in the road to stop trucks that try to bring plutonium into

> The dispute between Governor Hodges and [DOE] ... has been going on for over a year. It is Governor Hodges who has brought the dispute to court for resolution. This court could grant [Hodges'] motion for preliminary injunction, deny it or grant it on certain conditions. Until the court makes a specific ruling on the motion for preliminary injunction, it would be inappropriate for it to rule on the motion for summary judgment [on the counterclaim]. To do so would be rendering "an opinion advising what the law would be upon a hypothetical state of facts."

> \* \* \*

> For these reasons, Governor Hodges requests that this court deny defendants' motion for summary judgment on the counterclaim at this time or simply defer it until after ruling on the motion for preliminary injunction, which will establish a specific set of facts under which the motion for summary judgment can be judged. At that time, plaintiff Governor Hodges will be prepared to quickly provide argument on defendants' motion for summary judgment.

*Hodges v. Abraham*, No. 02–1426, Hodges' Response to Defendants' Motion for Summary Judgment on Counterclaim, May 31, 2002, Docket No. 32, at 2 (citations omitted in original) [hereinafter "Hodges' Response."].

Hodges' response thus did not directly dispute the elementary principle that the laws of the United States are supreme in matters which they regulate, or that this

> the state"); Declaration of W. Scott Simpson, Ex. H to DOE's Motion for Summary Judgment on the Counterclaim in *Hodges v. Abraham* (indicating that, as of May 11, 2002, the state website still contained a press release indicating Hodges' intent to interfere by physical means with the shipments of plutonium).

was an area of federal regulation. Rather, Hodges claimed that the court's review of DOE's counterclaim was premature pending the court's review of Hodges' motion for a preliminary injunction. Hodges then shifted focus back to the merits of his motion for injunctive relief, addressing the importance of ensuring NEPA compliance before any major federal action is permitted. In this regard he specifically relied on *Public Service Company of Colorado v. Andrus,* 825 F.Supp. 1483, 1505 (D.Idaho 1993), which Hodges described as a "case enjoining the shipment of nuclear wastes to an Idaho nuclear facility despite national security claims by [DOE]." Hodges' Response, at 9.

What Hodges omitted from his response is that an earlier decision in that same case held that the Governor of Idaho's threatened attempt to interfere by physical means with the shipment of plutonium, despite the Idaho Governor's pending action against DOE (raising NEPA claims), was a violation of the Commerce and Supremacy Clauses of the United States Constitution and was preempted by the AEA. *See Public Serv. Co. of Colo. v. Andrus,* Nos. 91–0035, 91–0054, 1991 WL 87528, at *2–3 (D.Idaho May 7, 1991) (unpublished opinion). In this earlier opinion the Idaho District Court held that the position taken by the Governor of Idaho, in defending a similar motion by DOE, was "untenable" because "the Supremacy Clause and the Commerce Clause are designed to prevent just the sort of parochial action taken by Governor Andrus." In short, not only was the only authority cited by Hodges in his response irrelevant to the issues raised by DOE's motion, but the full history of that very case demonstrates that the law has long been clearly established that a governor of a state may not use physical means to interfere with federal shipments of nuclear material, even pending ongoing litigation over the legality of the shipments.

This court responded to Hodges' request for deferral of a ruling on the counterclaim with an order entered June 4, 2002. In that order, the court granted Hodges' request that it "defer ruling on the motion for summary judgment on the counterclaim until after it rule[d] on Plaintiff's Motion for Preliminary Injunction." Nonetheless, the court advised Hodges that he "shall be required to comply with the existing scheduling order to present any legal argument he intends to advance in opposition to Defendants' motion." The court also reminded Hodges that the relevant deadline was June 6, 2002, and expressly warned him that: "Authorities not submitted by this deadline will not be considered." Order entered June 4, 2002 in *Hodges v. Abraham,* Docket No. 36.

Despite this warning, and his failure to cite any authority for his position in the earlier memorandum, Hodges did not file any further response to DOE's motion for summary judgment on the counterclaim. Thus, at the time of the motions hearing in *Hodges v. Abraham,* this court had nothing from Hodges indicating whether he intended to take the actions that DOE challenged prospectively, or suggesting that such action would be lawful.

Various motions in *Hodges v. Abraham* came before the court for hearing on June 13, 2002. After hearing extensive argument and some testimony, this court concluded not only that Hodges was not entitled to preliminary injunctive relief, but that DOE was entitled to summary judgment on the complaint. After so ruling, this court heard argument on DOE's motion for summary judgment on the counterclaim. *Hodges v. Abraham,* June 13, 2002 Hearing, Tr. at 180.

DOE's counsel requested that the court grant declaratory relief on the counterclaim. Hodges' counsel responded in a manner that suggested that DOE had mis-

construed Hodges' intent. That is, he suggested that Hodges intended only to pursue such relief as might be available through the courts or the political process, and did not intend to take any action which violated federal law:

> The order they seek against Governor Hodges is that he shall not interfere with these shipments. It is our understanding from what they have said that they thought that the bringing of this lawsuit was interference.
>
> Now, it is my understanding that *the Governor does not plan to break any state or federal law* but that he plans to look at what he can do to continue his fight against surplus plutonium from being shipped to the Savannah River Site without the NEPA review as a legal matter. And as a policy matter we have said that we objected to [DOE's] switch and bait technique....
>
> Now, we wish to appeal your honor's decision....
>
> Well, so, your honor, to the extent that doing things like filing a lawsuit are considered interfering with shipment of plutonium, Governor Hodges simply does not give up on his effort, but *in terms of violating federal laws, it is not my understanding that that is on the agenda.* It is Governor Hodges who brought this dispute to federal court for a resolution and he will continue fighting this in the federal courts.

Argument of William Want, Tr. at 181–83 (emphasis added).

DOE, in turn, indicated frustration that Hodges was misconstruing DOE's motion as challenging resort to legal process:

> I really don't understand how counsel for the Governor can be saying that he believed that what we were saying in our motion in our counterclaim is that the mere lawsuit constituted the interference against what we were seeking in this court's declaratory judgment. The first paragraph of our counterclaim makes clear ... "T he Governor of South Carolina has announced that he has decided to use physical means if necessary to stop the United States planned shipments of surplus federal plutonium into South Carolina." And then it says that "The declaration we were seeking is a declaration that any attempt by the Governor or by any person or entity acting in concert or participation with him to carry out his decision to stop such shipments by physical means would violate the Constitution of the United States."

Argument by W. Scott Simpson, Tr. at 184 (quoting from DOE's Answer to Complaint and Counterclaim in *Hodges v. Abraham,* Docket No. 8, ¶ 100). DOE's counsel then enumerated its evidence supporting the inference that Hodges might intend to utilize a blockade or other physical means to interfere with the shipments. Tr. at 184–85.

The court, based on the statements of Governor Hodges' counsel, which, it should be noted were made in Governor Hodges' presence,[5] deferred ruling. The court stated:

> It seems to me that were I to grant the motion I would be presuming that the governor intended to violate the law. I don't want to presume that. I don't believe he intends to violate the law. I think he intends to pursue his right to appeal and to get a final decision on this as soon as possible. And I believe that unless and until there is an imminent effort by him to violate the law that this would be premature; therefore, I am going to deny it without prejudice to your right to renew it if it does appear

---

**5.** Governor Hodges was present throughout the entire hearing on June 13, 2002. He did not attend the subsequent hearing on June 18, 2002, which is addressed by this order.

that in fact there is an imminent risk of action to interfere physically with the shipments.

I will say that I believe that the substance of your motion in terms of the law that is briefed by you is correct and that such actions, if they occurred, ... while this case was ongoing or after this case was ongoing [,] would constitute violations of the United States Constitution, But I don't have to reach that issue because I don't believe that the Governor intends to push it that far.

Discussion by the Court, Tr. at 186.

Further discussion followed regarding the problems that would occur if Hodges did decide to "direct a blockade." Tr. at 186–87. This led the court to require Hodges to "give notice to the court" if at some point in the future he "intends to pursue a physical means of stopping the shipments." Tr. at 187. Hodges' counsel responded that they would only be able to do so if they had an idea of the time frame for shipments which, as of that date, could have begun as early as June 15, 2002. Tr. at 187 ("We know what they have said that they intend to start sometime after the 15th, but, you know, the Governor has got some decisions he is going to have to make, and without adequate time frame then we would not be able to comply with your Order."). A discussion ensued as to whether DOE might delay the shipments' "not before date," which, it was determined, required a decision from persons not then in the courtroom.

The court then initially denied DOE's motion for summary judgment on the counterclaim without prejudice. Tr. at 189. However, in order to allow an appeal on the merits of the primary action to go forward, the court converted that to denial of the motion with prejudice and dismissal of the counterclaim as not ripe. The dismissal of the counterclaim was, therefore, without prejudice. Tr. at 191–192.

Upon query from DOE's counsel, the court reiterated its understanding that Governor Hodges had agreed to inform the court "if he is going to carry through on the blockade." Nonetheless, the court indicated its further understanding that this assumed DOE would give Hodges "an idea when [it was] going to start shipments then he will give me notice if he intends ... to take physical means to block shipments. And, of course, notice would probably be needed to be given to the Fourth Circuit if the case was in their jurisdiction at that point in time." Tr. at 190–91. To this, counsel for Hodges, responded: "I understand, your honor." Tr. at 191.

To expedite the right to appeal, the court directed that a judgment be entered immediately, which was accomplished. An appeal was immediately filed.

## 2. Events subsequent to the hearing in *Hodges v. Abraham*

The following day, Governor Hodges issued Executive Order No.2002–14 which declares a state of emergency in South Carolina. The first three paragraphs of that order refer to: (1) the recent detention of a person suspected of "planning to build and explode a radioactive 'dirty bomb;'" (2) a description of a "dirty bomb" as "a conventional incendiary device laced with radioactive materials that upon detonation scatters and disperses radioactive particles into the atmosphere, thereby exposing potentially thousands of persons to radiation;" and (3) a belief that "weapons-grade plutonium is a primary ingredient utilized in creating dirty bombs." The Executive Order then recites DOE's plan to "begin sending truck shipments of weapons-grade plutonium to [SRS] located in Aiken and Barnwell Counties, South Carolina as soon as June 15, 2002." It then proceeds:

**WHEREAS,** when, in the Governor's opinion, a danger exists to the person or property of any citizen and the peace and tranquility of the State or of any political subdivision or particular area of the State designated by him is threatened, the Governor shall declare an emergency and may take such measures and do all and every act and thing which he may deem necessary in order to prevent violence or threats of violence to the person or property of citizens of the State and to maintain peace, tranquility and good order, pursuant to § 1–3–410, et. seq., of the South Carolina Code of laws;

**WHEREAS,** the Governor may further cope with such threats and danger by directing and ordering any person or group of persons to do any act which would, in his opinion, prevent or minimize danger to life, limb or property, or prevent a breach of the peace; and he may order any person or group of persons to refrain from doing any act or thing which would, in his opinion, endanger life, limb or property, or cause, or tend to cause, a breach of the peace, or endanger the peace and good order of the State ... and he shall have full power by use of all appropriate available means to enforce such order or proclamation, pursuant to § 1–3–430;

**WHEREAS,** for the purposes already stated, the Governor may also order any and all law enforcement officers of the State ... to do whatever may be deemed necessary to maintain peace and good order; order the discontinuance of any transportation or other public facilities, or, .... order or direct any State, county or city official to enforce the provisions of such proclamation in the courts of the State by injunction, mandamus, or other appropriate legal action, pursuant to § 1–3–440; and

**WHEREAS,** a legitimate threat of theft, diversion, or use of plutonium by terrorists exists that requires serious protective measures to prevent the terrorist use of plutonium in South Carolina and to protect the citizens of South Carolina from the threat and effect of dirty bombs or other related terrorist devices;

**THEREFORE,** I hereby declare that an emergency exists and order that the transportation of plutonium on South Carolina roads and highways is prohibited; that any persons transporting plutonium shall not enter the State of South Carolina; and that any persons nevertheless attempting or intending to transport plutonium along the public thoroughfares of the State of South Carolina shall give notice of such intention and to cease and desist from such action until further direction is given.

I further order and direct the South Carolina Department of Public Safety to increase and enhance its security, patrol, inspection, and surveillance measures along South Carolina's highways, particularly in the areas along our state's borders and surrounding the Savannah River Site, and to enforce the provisions of this Executive Order.

Executive Order No.2002–14 (signed June 14, 2002).

This court was not given notice by Governor Hodges that he intended to sign this order or that he had done so. Neither was this court given notice by Hodges of the State's affirmative actions, taken in accordance with his Executive Order, which included sending a large number of state law enforcement officers to a crossroads near the entrance to SRS on Friday, June 14, 2002. DOE has submitted affidavits indicating that these officers stopped and searched at least two trucks. It is notable that this apparent blockade occurred the day *before* the earliest possible shipment at

issue could have occurred.[6] Thus, it seems that this action may have been intended primarily to gain media attention.[7]

On Monday morning, June 17, 2002, the court received a conference call from counsel for DOE and Hodges informing the court that DOE would be filing a suit that evening reasserting the claims that had been counterclaims in *Hodges v. Abraham.* DOE's counsel also informed the court that DOE would be seeking emergency relief declaring Governor Hodges' Executive Order illegal and prohibiting him from interfering with federal shipments of plutonium. Given the urgency of the situation, counsel agreed to the scheduling of a hearing for 11:00 a.m. the following day. The suit and motion papers were filed later on June 17, 2002. The present action simply reverses the parties from the prior action (*Abraham v. Hodges* rather than *Hodges v. Abraham*), and reasserts the counterclaim as a claim, with the added factual basis developed since June 13, 2002.

### 3. Hearing in *Abraham v. Hodges*

Immediately prior to the hearing set for June 18, 2002, in the present action, counsel for both DOE and Hodges asked to meet privately with the court. At that time, they informed the court that the hearing would not need to be lengthy as Governor Hodges did not have any opposition to present. The court then confirmed that counsel for Hodges would acknowledge on the record that Hodges: (1) had been properly served with the complaint; (2) waived any right to file an Answer or file any papers in opposition to DOE's motions; (3) agreed that the matter could be resolved on its merits on DOE's motion for summary judgment; and (4) conceded that Hodges had no legal arguments to offer in opposition to DOE's motions. These matters were all placed on the record at the commencement of the hearing. Tr. at 4–5.[8] In light of these concessions, very little argument was offered by either side.

### STANDARD

Although there are several motions pending, Hodges conceded that the matter could be resolved on DOE's motion for summary judgment. Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). It is well established that summary judgment should be granted "only when it is clear that there is no dispute concerning either the facts of the controversy or the inferences to be drawn from those facts." *Pulliam Inv. Co. v. Cameo Properties,* 810 F.2d 1282, 1286 (4th Cir.1987). The party moving for summary judgment has the burden of showing the absence of a genuine issue of material fact, and the court must view the evidence before it and the inferences to be drawn therefrom in the light most favorable to the nonmoving party. *United*

---

**6.** Late in the day on June 14, 2002, DOE gave notice that it would not make any shipments of the Rocky Flats plutonium to SRS until June 22, 2002, at the earliest. At the time this blockade was commenced, therefore, the not-before date for shipment was June 15, 2002.

**7.** A diagram submitted as an attachment to the affidavit of one of the witnesses to these events shows that at least three television stations had film crews at the site of the blockade.

**8.** In this regard, Governor Hodges' counsel conceded at the hearing: "We do not have any discussion on the merits. Your Honor asked me in chambers if we had any authority to the contrary of what the [federal] government had raised in its memorandum and we do not." Tr. at 5.

*States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962).

In the present case, there is no dispute at all in the record. Hodges concedes that the facts are as DOE presents them. He also concedes that there is no dispute as to the applicable law or its interpretation. In short, he does not dispute that the actions contemplated by his Executive Order No.2002–14 and his publicized plans to block federal shipments of plutonium violate the laws and Constitution of the United States. *See supra* note 8.

While this court could stop its analysis at this point given Hodges' concessions, it declines to do so in light of Hodges' actions preceding the June 18, 2002 hearing. Instead, this court will review the law so that there will be no doubt as to the illegality of state action to interfere, or attempt to interfere by physical means, with federal shipments of nuclear materials into or through this State.

### DISCUSSION

Governor Hodges' Executive Order, mandating that the South Carolina Department of Public Safety enforce a ban on the United States' transportation of plutonium on South Carolina roads and highways, contravenes well-established constitutional law. Such restrictions on the activities of the United States or its officers violate the principle of intergovernmental immunity embodied in the Supremacy Clause of the United States Constitution. *See* U.S. CONST. art. VI, § 1, cl. 2. Governor Hodges' Executive Order is, moreover, preempted by the federal Atomic Energy Act of 1954(AEA), 42 U.S.C. § 2011 *et seq.,* which occupies the field in the area of health and safety of nuclear material and its shipment. Finally, Hodges' actions violate the Commerce Clause of the United States Constitution, which places the regulation of interstate com-

merce in the hands of the federal government. *See* U.S. CONST. art. I, § 8, cl. 3.

### 1. The Supremacy Clause

The United States Constitution embodies the fundamental principle that in certain areas the United States must act as a single nation, led by the federal government, rather than as a loose confederation of independent sovereign states. Under the Supremacy Clause of the Constitution, a state may not interfere with federal action taken pursuant to the exclusive powers granted under the United States Constitution or under congressional legislation occupying the field. The Supremacy Clause provides:

> This Constitution, and the Laws of the United States which shall be made in Pursuance thereof ... shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

U.S. CONST. art. VI, § 1, cl. 2. Chief Justice Marshall, writing for the Supreme Court in *McCulloch v. Maryland,* stated that the purpose of this Clause is "to remove all obstacles to [the federal government's] action within its own sphere, and so to modify every power vested in subordinate governments, as to exempt its own operations from their own influence." 17 U.S. (4 Wheat.) 316, 427, 4 L.Ed. 579 (1819). Thus, when the federal government acts within its own sphere or pursuant to the authority of Congress in a given field, a state may not interfere by means of a conflicting attempt to promote its own local interests.

Two doctrines have developed out of conflicts involving the Supremacy Clause. *United States v. Ferrara,* 847 F.Supp. 964, 968 (D.D.C.1993), *aff'd,* 54 F.3d 825 (D.C.Cir.1995). First, the doc-

trine of "intergovernmental immunities" establishes that "even in the absence of a specific federal law, federal officers are immune from state interference with acts 'necessary and proper' to the accomplishment of their federal duties." *Id.* (citing *In Re Neagle*, 135 U.S. 1, 10 S.Ct. 658, 34 L.Ed. 55 (1890)). The second doctrine provides that federal legislation preempts state action in several circumstances. For example, the Supremacy Clause invalidates state law when (1) Congress expressly preempts state law, (2) congressional intent to preempt state law can be inferred by a federal regulation "sufficiently comprehensive . . . [to] le[ave] no room for supplementary regulation," (3) "federal interest [in a field] is so dominant that [the] federal system will be assumed to preclude enforcement of state laws on same subject," and (4) even though federal law has not displaced state regulation entirely, state law conflicts with federal law. *See Hillsborough County v. Automated Labs., Inc.*, 471 U.S. 707, 712–13, 105 S.Ct. 2371, 85 L.Ed.2d 714 (1985). Both of these doctrines apply here and render Governor Hodges' Executive Order unconstitutional.

### a. Federal Action Necessary and Proper to Carry Out Federal Duties

It is well-established that a state cannot interfere with a valid exercise of federal authority. *See Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 180 n. 1, 108 S.Ct. 1704, 100 L.Ed.2d 158 (1988) (stating that the Supremacy Clause "immunizes the activities of the Federal Government from state interference"); *Hancock v. Train*, 426 U.S. 167, 179, 96 S.Ct. 2006, 48 L.Ed.2d 555 (1976) (holding that no state could prevent the operation of a federally owned power facility until the facility had secured a state permit for the discharge of pollutants given "the fundamental importance of the principles shielding federal installations and activities from regulation by the States"); *Johnson v. Maryland*, 254 U.S. 51, 55, 41 S.Ct. 16, 65 L.Ed. 126 (1920) (striking down state's attempt to prevent a federal postal employee from performing his duties until he had obtained a state driver's license and holding that the states cannot "interrupt the acts of the general government itself"); *McCulloch*, 17 U.S. (4 Wheat.) at 436 ("[T]he states have no power, by taxation or otherwise, to retard, impede, burden, or in any manner control, the operations of the constitutional laws enacted by congress to carry into execution the powers vested in the general government.").

DOE's proposed shipment of surplus plutonium into South Carolina is a federal activity involving the execution of powers exclusively vested in the federal government. One of the principal roles of the federal government, under the Constitution, is national defense. *See* U.S. CONST. art. I, § 8, cls. 11–14; art. II, § 2, cl. 1. By federal statute, DOE is responsible for the integrity and safety of the nation's nuclear weapons, and for the management and disposition of nuclear materials including plutonium. *See* 42 U.S.C. §§ 7112, 7132, 7133(a)(8), 7274m, 7274n, 7274p; Plaintiffs' Memorandum in Support of Temporary Restraining Order, Preliminary Injunction, and Summary Judgment, Ex. 2, ¶ 7 (Declaration of Linton F. Brooks) (hereinafter "Plaintiffs' Memorandum"). The court has also discussed at length in previous orders the national security interests implicated by any delay or interference with DOE's plan to transport the Rocky Flats surplus plutonium to SRS at this time. *See Hodges v. Abraham*, No. 02–1426, Order Granting Defendants' Motion for Summary Judgment on Governor Hodges' Complaint and Denying Governor Hodges' Motion for a Preliminary Injunction, Docket No. 56, (D.S.C. July 17, 2002), and *Hodges v. Abraham*, No. 02–1426, Order Dismissing Counterclaim, Docket No.

55, (D.S.C. July 14, 2002). *See also United States v. Livingston,* 179 F.Supp. 9, 16 (E.D.S.C.1959), *aff'd per curiam,* 364 U.S. 281, 80 S.Ct. 1611, 4 L.Ed.2d 1719 (1960) (finding "the explosion [at] ... Hiroshima ... led ... Congress to give careful consideration to the needs ... of the nation for the use, control and development of this new source of energy .... to insure that this great power of destruction should not be misused ... [and Congress] conclu[ded] that a strict governmental monopoly and rigid controls were required").

Foreign policy is also another power vested exclusively in the federal government by the Constitution. *See* U.S. CONST. art. II, § 2, cl. 2, § 10, cls. 1–3; art. II, § 3; *Japan Line, Ltd. v. Los Angeles County,* 441 U.S. 434, 448, 99 S.Ct. 1813, 60 L.Ed.2d 336 (1979) (" 'In international relations ... the people of the United States act through a single government with unified and adequate national power.' ") (quoting *Board of Trustees v. United States,* 289 U.S. 48, 59, 53 S.Ct. 509, 77 L.Ed. 1025 (1933)); *Hines v. Davidowitz,* 312 U.S. 52, 63, 61 S.Ct. 399, 85 L.Ed. 581 (1941) ("The Federal Government ... is entrusted with full and exclusive responsibility for the conduct of affairs with foreign sovereignties."). The court has also discussed at length in a prior order the foreign policy matters that are implicated in this matter. *See Hodges v. Abraham,* No. 02–1426, Order Granting Defendants' Motion for Summary Judgment on Governor Hodges' Complaint and Denying Governor Hodges' Motion for a Preliminary Injunction, Docket No. 56, (D.S.C. July 17, 2002).

■ Given that (1) federal law directs DOE to safeguard, manage, and dispose of nuclear materials, (2) DOE's action pursuant to this mandate implicates both national security and foreign policy interests in this case, and that (3) DOE will use federal employees and federal vehicles to transport the surplus plutonium from Rocky Flats to SRS—both federal facilities—the court finds that the proposed shipments of Rocky Flats surplus plutonium to SRS are clearly federal functions that cannot be interfered with by state action. Governor Hodges' Executive Order, prohibiting DOE's shipment of plutonium into South Carolina and directing various physical means to stop it, is illegal, null, and void under the Supremacy Clause of the United States Constitution.

### b. The Atomic Energy Act (AEA) Preempts Contradictory State Action

Within constitutional limits, Congress may expressly preempt state authority. *Pacific Gas & Elec. Co. v. State Energy Res. Conservation & Devel. Comm'n,* 461 U.S. 190, 203, 103 S.Ct. 1713, 75 L.Ed.2d 752 (1983). Absent express preemption, the Supreme Court has determined:

> Congress' intent to supersede state law altogether may be found from a scheme of federal regulation ... so pervasive as to make reasonable the inference that Congress left no room to supplement it, because the Act of Congress may touch a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject, or because the object sought to be obtained by the federal law and the character of obligations imposed by it may reveal the same purpose.

*Id.* at 203–04, 103 S.Ct. 1713 (internal quotation marks omitted). In addition, even if Congress has not entirely displaced state regulation in a specific field, "state law is preempted to the extent it conflicts with federal law." *Id.* at 204, 103 S.Ct. 1713. For example, when "compliance with both federal and state regulations is a physical impossibility," or when state law "stands as an obstacle to the accomplishment and execution of the full purposes and objec-

tives of Congress," federal law controls. *Id.* (quoting *Florida Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 142–43, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963) and *Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 85 L.Ed. 581 (1941)).

The Atomic Energy Act of 1954(AEA) vests the federal government, particularly DOE, with the power to govern all safety and health aspects regarding the possession, control, and shipment of certain nuclear materials, including plutonium. 42 U.S.C. §§ 2011 *et seq.;* Pub.L. No. 83–703, 68 Stat. 919 (1954). The Act specifically authorizes DOE:

> [to] establish by rule, regulation, or order, such standards and instructions to govern the possession and use of special nuclear material, source material, and byproduct material as the [DOE] may deem necessary or desirable to promote the common defense and security or to protect health or to minimize danger to life or property....

*Id.* § 2201(b).[9] The AEA therefore authorizes DOE to "make such disposition as it may deem desirable of radioactive materials," *id.* § 2201(j), and to "prescribe such regulations or orders as it may deem necessary ... to guard against the loss or diversion of any special nuclear material acquired by any person ... to prevent any

use or disposition thereof which the [DOE] may determine to be inimical to the common defense and security." *Id.* § 2201(i). The AEA's official statement of "purpose" provides that DOE should "control ... the possession, use, and production ... to make the maximum contribution to the common defense and security and the national welfare, to provide continued assurance of the Government's ability to enter into and enforce" international agreements. *See* 42 U.S.C. § 2013(c). One court has explained: "The federal government's historic role as the force behind the discovery and utilization of nuclear power gives it a longstanding monopoly over all matters nuclear." *Long Island Lighting Co. v. County of Suffolk,* 628 F.Supp. 654, 662 (E.D.N.Y.1986).[10]

The preemptive scope of the AEA is established by *Pacific Gas & Electric Company v. State Energy Resources Conservation & Development Commission,* 461 U.S. 190, 103 S.Ct. 1713, 75 L.Ed.2d 752 (1983), where the Supreme Court summarily dismissed a state's attempt to interfere with the federal government's nuclear policies. In that case, a utility company sought to enjoin enforcement of a state statute that imposed a moratorium on the construction of new nuclear power plants until a plan for disposal of the nuclear waste from such plants was developed and

---

9. Certain provisions of the AEA use the term "Commission," and the definitions section of the Act states that "Commission" means "Atomic Energy Commission." 42 U.S.C. § 2014(f). However, the Atomic Energy Commission was abolished in 1974. Pub.L. No. 93–438, § 104, 88 Stat. 1233, 1237 (1974). Its licensing and related regulatory functions were transferred to the Nuclear Regulatory Commission, 42 U.S.C. § 5841(f); and its operational, national security, and energy research and development functions were transferred to the Energy Research and Development Administration, then later to the Department of Energy. *Id.* §§ 5814(c), 7151(a).

10. The AEA further demonstrates Congress' intent to "occupy the field" with federal legislation, by vesting other duties regarding nuclear materials in the federal Nuclear Regulatory Commission (NRC). For example, the possession, transfer, or delivery of special nuclear material (including plutonium) by private persons or entities is expressly prohibited, except under license by the NRC. 42 U.S.C. § 2077(a). Any violation or attempted violation of this prohibition is subject to criminal penalties, including a fine of $10,000 or imprisonment for not more than ten years or both. *Id.* § 2272. The penalties are much greater if there was an "intent to injure the United States or ... to secure an advantage to any foreign nation." *Id.*

approved by the federal government. *Id.* at 198, 103 S.Ct. 1713. Based on its review of the plain language and legislative history of the AEA, the Supreme Court held that "from the passage of the AEA in 1954, through several revisions, and to the present day, ... the safety of nuclear technology [is] the exclusive business of the Federal Government." *Id.* at 208, 103 S.Ct. 1713. Thus, said the Court, "[a] state moratorium on nuclear construction grounded in safety concerns falls squarely within the prohibited field" and would be preempted by the Atomic Energy Act. *Id.* at 213, 103 S.Ct. 1713.[11] *Accord United States v. Kentucky,* 252 F.3d 816, 820–21, 823 (6th Cir.), *cert. denied,* 534 U.S. 973, 122 S.Ct. 396, 151 L.Ed.2d 300 (2001) (holding that "AEA grants DOE and the Nuclear Regulatory Commission exclusive responsibility for regulating source, special nuclear, and byproduct material .... [and] preempts any state attempt to regulate materials covered by the Act for safety purposes"); *Jersey Cent. Power & Light Co. v. Lacey Tp.,* 772 F.2d 1103, 1110–12 (3d Cir.1985) (holding township ordinance prohibiting importation of spent nuclear fuel or other radioactive waste for the purpose of storage was preempted by AEA); *People of Ill. v. Gen. Elec. Co.,* 683 F.2d 206, 208, 215 (7th Cir.1982) (holding that AEA preempts state statute prohibiting "transport into State for disposal or storage of any spent nuclear fuel which was used in any power generating facility located outside State"); *Wash. State Building & Const. Trades Council v. Spellman,* 684 F.2d 627, 630 (9th Cir.1982); *Long Island Lighting Co. v. County of Suffolk,* 628 F.Supp. 654, 662–66 (E.D.N.Y. 1986) (holding preempted by AEA municipal ordinance that prohibited certain aspects of an emergency-response test required before the Nuclear Regulatory Agency would license nuclear power plant).

■ Unquestionably, Governor Hodges' Executive Order prohibiting the transportation of plutonium within South Carolina impermissibly interferes with the exclusive federal authority marked out by the AEA. The Act forbids anyone other than DOE to "transfer, deliver, acquire, own, possess, receive possession of or title to, or import into or export from the United States any special nuclear material," including plutonium, except under license by the Nuclear Regulatory Commission. 42 U.S.C.

---

**11.** The Court in *Pacific Gas* went on to hold that the state statute at issue there was aimed, not at "radiation hazards," but at "economic problems." 461 U.S. at 213, 103 S.Ct. 1713. Specifically, the state legislature was concerned that, "[w]ithout a permanent means of disposal, the nuclear waste problem could become critical, leading to unpredictably high costs to contain the problem or, worse, shutdowns in reactors." *Id.* at 213–14, 103 S.Ct. 1713. Therefore, the Court held, the statute was within the state's traditional authority over "the economic aspects of electrical generation," rather than the federal government's exclusive authority over "nuclear safety regulation." *Id.* at 206, 216, 103 S.Ct. 1713.

This principle has no application here. Governor Hodges has repeatedly invoked health and safety concerns in objecting to DOE's shipment of Rocky Flats plutonium to SRS, most recently in the Executive Order.

*See, e.g.,* Executive Order 2002–14 (referring to dangers of plutonium); *see also* Plaintiffs' Memorandum, ex. 2 Declaration of W. Scott Simpson, ¶ 3 & Governor Hodges' "State of the State" Address, Jan. 16, 2002; *Hodges v. Abraham,* No. 02–1426, Memorandum in Support of Defendants' Motion for Summary Judgment on Their Counterclaim, ex. J (letter from Governor Hodges to Secretary of Energy, Apr. 10, 2002). Regardless of Governor Hodges' motivation, his announced decision to stop the shipments cannot fall within the "economic" exception of *Pacific Gas* because that exception was based on the states' traditional authority over nonfederal entities regarding the generation of electricity. *See* 461 U.S. at 205–06, 103 S.Ct. 1713. The states do not, by contrast, have any traditional authority regarding any "economic" aspects of the federal government's transportation of plutonium.

§ 2077(a). Governor Hodges therefore seeks to prevent activity that is fully regulated and permitted by federal statute in a field preempted by the federal government. Accordingly, Governor Hodges' Executive Order is void as preempted by the AEA.

### 2. The Commerce Clause

■ Governor Hodges' Executive Order prohibiting the transportation of plutonium into South Carolina also violates the Commerce Clause. The Commerce Clause vests in the federal government the exclusive authority to "regulate Commerce with foreign Nations, and among the several States." *See* U.S. CONST. art. I, § 8, cl. 3. This Clause operates "not only as an authorization for congressional action, but also, even in the absence of a conflicting federal statute, as a restriction on permissible state regulation." *Hughes v. Oklahoma*, 441 U.S. 322, 326, 99 S.Ct. 1727, 60 L.Ed.2d 250 (1979).

■ State laws or regulations that expressly discriminate against interstate commerce by impeding the interstate transportation of products are "virtually *per se* " invalid. *Philadelphia v. New Jersey*, 437 U.S. 617, 624, 98 S.Ct. 2531, 57 L.Ed.2d 475 (1978).[12] The Supreme Court has held that "[t]he clearest example of . . . [expressly discriminatory] legislation is a law that overtly blocks the flow of interstate commerce at a State's borders." *Philadelphia*, 437 U.S. at 624, 98 S.Ct. 2531. Governor Hodges' Executive Order, declaring that "any persons transporting plutonium shall not enter the State of South Carolina," constitutes express discrimination against interstate commerce.[13] Governor Hodges' Executive Order seeks to block the transportation into the State of plutonium from outside South Carolina.[14] Like the laws struck down in other cases, Governor Hodges' Executive Order prohibiting DOE's ship-

**12.** In certain other cases where a state statute "regulates evenhandedly to effectuate a legitimate local public interest," but has an "incidental" effect on interstate commerce, courts use a balancing test. In applying this balancing test, courts examine whether "the burden imposed on . . . commerce is clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970); *see also Med. Waste Assocs. v. Mayor & City Council of Baltimore*, 966 F.2d 148, 150 (4th Cir.1992). *Cf. C & A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, 390, 114 S.Ct. 1677, 128 L.Ed.2d 399 (1994) ("As we find that the ordinance [expressly] discriminates against interstate commerce, we need not resort to the *Pike* test.").

**13.** DOE's shipment of plutonium to SRS plainly constitutes interstate commerce for purposes of delineating the roles of the federal and state governments pursuant to the Commerce Clause. The Supreme Court has rejected a restrictive view of what constitutes "commerce" for this purpose: "All objects of interstate trade merit Commerce Clause protection; none is excluded by definition at the

outset." *Philadelphia*, 437 U.S. at 622, 98 S.Ct. 2531 (holding that solid waste is an article of commerce, even if it has no value). Although DOE's shipment of plutonium will be performed by federal employees, those employees will be crossing several interstate boundaries during the shipment, traveling in vehicles that were built and purchased in interstate commerce and over roads that are built and repaired with items from interstate commerce, and using fuel purchased in interstate (or international) commerce. *See* Plaintiffs' Memorandum, ex. 2, Declaration of Everet H. Beckner ¶ 4. *See generally United States v. Livingston*, 179 F.Supp. 9 (E.D.S.C. 1959) (holding that contractor involved in operation of SRS was immune from state taxation), *aff'd per curiam*, 364 U.S. 855, 81 S.Ct. 35, 5 L.Ed.2d 79 (1960).

**14.** In addition to declaring that "any persons transporting plutonium shall not enter the State of South Carolina," the Executive Order purports to prohibit transporting plutonium within South Carolina, whether between two points inside the State or from a point in the State to a point outside the State. Those

ments of plutonium into South Carolina "applies only to [plutonium] brought in from other states." *People of Ill. v. Gen. Elec. Co.*, 683 F.2d 206, 213 (7th Cir.1982). Given that Governor Hodges' Executive Order stopping any shipment of plutonium into South Carolina is expressly discriminatory, the court holds it unconstitutional without resort to further analysis.[15] *Gen. Elec. Co.*, 683 F.2d at 208, 213–14 (striking down as against the Commerce Clause state law prohibiting "transport into ... State for disposal or storage any spent nuclear fuel which was used in any power generating facility located outside ... State"); *Spellman*, 684 F.2d at 629–32 (rejecting as violation of Commerce Clause state statute that purported to close the state's borders to "the entry of low-level radioactive waste originating outside the state").

## CONCLUSION

The court therefore finds Governor Hodges' Executive Order null and void as a violation of the Supremacy Clause and the Commerce Clause of the United States Constitution and preempted by the Atomic

---

aspects of the Executive Order would apply to various other activities of the Department of Energy that involve, to one degree or another, the shipment of plutonium, in addition to the planned shipments of surplus plutonium from Rocky Flats to SRS. *See* Plaintiffs' Memorandum, ex. 2, Second Declaration of Jessie Hill Roberson, ¶¶ 4–8. Given that those other activities also occur in interstate commerce, the Executive Order would violate the Commerce Clause as applied to those activities as well. *See Pike*, 397 U.S. 137, 146, 90 S.Ct. 844, 25 L.Ed.2d 174 (striking down state statute that had "only incidental" effect on interstate commerce); *Med. Waste Assocs.*, 966 F.2d at 151 (statute with incidental effect on interstate commerce must not "impose a burden on commerce that is clearly excessive in relation to the putative local benefits"). Even if the Executive Order's prohibition against *intrastate* transportation of plutonium did not violate the Commerce Clause as applied to the federal government, it would violate the Supremacy Clause for the reasons explained in Section I above.

15. In certain other cases involving express discrimination against interstate commerce, courts have examined under the "the strictest scrutiny ... any purported legitimate local purpose and ... absence of nondiscriminatory alternatives." *Hughes*, 441 U.S. at 337, 99 S.Ct. 1727. The state bears the burden moreover to "demonstrate, under rigorous scrutiny, that it has no other means to advance a legitimate local interest." *C & A Carbone, Inc. v. Town of Clarkstown, N.Y.*, 511 U.S. 383, 392, 114 S.Ct. 1677, 128 L.Ed.2d 399 (1994). *See also Envtl. Tech. Council v. Sierra Club*, 98 F.3d 774, 787 (4th Cir.1996) (striking down statute where state failed to demonstrate that no neutral alternatives exist to discrimination). "This is an extremely difficult burden," *Camps Newfound/Owatonna, Inc. v. Town of Harrison, Me.*, 520 U.S. 564, 582, 117 S.Ct. 1590, 137 L.Ed.2d 852 (1997), and numerous decisions have struck down state statutes and ordinances as violative of the Commerce Clause notwithstanding that they serve presumably legitimate goals or valid local interests. *See, e.g., Philadelphia*, 437 U.S. at 627, 98 S.Ct. 2531.

Even if this "rigorous scrutiny" analysis were to apply here rather than the *"per se invalid"* rule applied above, Governor Hodges' decision to stop DOE's plutonium shipments and his Executive Order to that effect would nonetheless be impermissible. In promulgating his Executive Order, Governor Hodges cannot rely on the public health and safety of South Carolina and its citizens to justify this overt discrimination against interstate commerce. First, Governor Hodges' concerns for the health, safety, and welfare of South Carolina and its citizens are met by DOE's exclusive responsibility for and adherence to the health and safety measures provided for nuclear material. Second, because unstabilized plutonium and other nuclear materials are already stored in South Carolina, Governor Hodges cannot establish that the only way to protect South Carolina citizens is to exclude the stabilized plutonium shipments from Rocky Flats. Whether couched in health and safety concerns or economic and commercial concerns, a blockade of plutonium at the State's border violates the Commerce Clause.

Energy Act of 1954. Accordingly, the court grants DOE's Motion for Summary Judgment, and permanently enjoins Jim Hodges, Governor of South Carolina, his successor, and any person or entity acting in concert or participation with him, including his employees, agents, servants, attorneys, and any other person acting or purporting to act on behalf of the State of South Carolina, from physically interfering with, stopping, or attempting to stop the Department of Energy's shipments of plutonium into or through South Carolina.

IT IS SO ORDERED.